STATE OF NEBRASKA, APPELLEE, V. ROBERT C. NORFOLK,
APPELLANT.
381 N.W.2d 120

Filed February 7, 1986.    No. 85-045.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE,
SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Robert C. Norfolk appeals his conviction for first degree murder after a bench trial in the district court for Douglas County. We affirm.

In May 1984 Norfolk rented a room in the residence of his aunt, Della Jones. On the morning of May 12, after a night of drinking, Norfolk returned to his room, obtained a butcher knife from the kitchen, cut the telephone lines in the house, stabbed Jones, and strangled her to death.

Later on May 12, Jones' niece, Barbara, became concerned about Jones' well-being when Jones neither answered her telephone nor responded to knocks on the front door of her house. Near 4 p.m., Barbara observed Norfolk entering Jones' residence and asked a friend, Larry Nelson, to inquire about her aunt's whereabouts. Nelson confronted Norfolk, who, after stating that Jones had left town around 3 o'clock to visit her sister, drove away in his car. Sometime close to 7:30 p.m., Barbara entered Jones' residence, found Jones lying on the floor, and contacted the police.

On May 13, at approximately 9:30 p.m., a police officer in downtown Omaha noticed that the automobile being driven by Norfolk matched the description of the vehicle associated with the Jones homicide and stopped the Norfolk car. When the officer mentioned that Norfolk was a suspect in a homicide investigation, Norfolk replied, "Do yourself a favor and call a backup." The officer arrested Norfolk, who responded, "Don't shoot. I was on my way down to turn myself in anyway." Later, in the course of his conversation with the arresting officer, Norfolk again mentioned that he was on his way to the police station to turn himself in "for the killing." According to the officer, at the time of the arrest Norfolk seemed "nervous and a little upset" but did not appear to be under the "influence of any drugs or alcohol."

Norfolk was taken to the police station, where, at 10:55 p.m., Officer James C. Wilson informed Norfolk of the *Miranda* rights. After Norfolk orally waived his *Miranda* rights and then signed the standard *Miranda* advisory form used by Omaha police, Wilson commenced interrogation, which lasted more than 2 hours and resulted in Norfolk's oral statement that

he had stabbed Jones, strangled her lifeless, and had intercourse with her. Wilson had told Norfolk that the officer "knew everything," because Wilson had a copy of the autopsy report concerning Jones and "can see it here in the report." In fact, an autopsy report had not been issued at the time of Wilson's remark to Norfolk. Another officer told Norfolk, "Well, maybe you'd feel better if you would tell us everything." After his oral statement Norfolk agreed to give a tape-recorded statement. Wilson again informed Norfolk concerning the *Miranda* rights. At commencement of the recorded interrogation, Wilson commented that the statement to be recorded was for "the official record." Norfolk, at that point and for the first time, requested an attorney. Wilson ignored the request for an attorney and Norfolk's later demand that the recorder be turned off. Throughout the interrogation, Wilson had no difficulty communicating with Norfolk, who appeared to understand all questions asked by Wilson.

The State filed an information charging Norfolk with first degree murder, namely, Norfolk had killed Jones "purposely and of deliberate and premeditated malice or in the perpetration of, or in an attempt to perpetrate a sexual assault in the first degree . . . ." See Neb. Rev. Stat. § 28-303 (Reissue 1979). Norfolk moved to suppress his custodial statements made to police. After an evidentiary hearing on Norfolk's motion, the district court determined that the taped statement, although voluntary, was obtained in violation of Norfolk's *Miranda* rights; therefore, the tape-recorded statement was not admissible during the State's case in chief, but could be used for impeachment purposes as part of the State's rebuttal evidence. The court also concluded, however, that Norfolk had "knowingly and voluntarily" waived the *Miranda* rights concerning Norfolk's oral statement made before his taped statement and that such oral statement, "given voluntarily in compliance with the Miranda rights," was thereby admissible for the State's case in chief.

Before trial Norfolk notified the State of his intention to assert an insanity defense, see Neb. Rev. Stat. § 29-2203 (Cum. Supp. 1984), and then waived his right to a jury trial. At trial the State relied primarily on testimony from officers involved in

Norfolk's interrogation, who recited the oral statement made by Norfolk before he requested an attorney; testimony from Jones' niece, Barbara, and her friend, Leroy Nelson, who described the events leading to the discovery of Jones' body; and testimony from the investigating officer, who, when describing the interior of Jones' residence, testified that the cords of two telephones had been cut. The State also called Carol Quiroz and Norfolk's former employer, Richard Ogden, as witnesses to testify about certain aspects of Norfolk's behavior. Quiroz had been acquainted with Norfolk for 2½ years and was a tenant at the apartment house where Norfolk lived before he rented from Jones. Ogden had employed Norfolk for approximately 5 months. When the prosecutor asked Quiroz whether she was aware of Norfolk's having any "delusions" or whether she had observed Norfolk "hallucinating," "seeing things," or "hearing voices," Norfolk's counsel objected that the question called for a conclusion "[Quiroz] is not qualified to answer." The court overruled the objection and Quiroz answered, "No." Ogden was asked whether he was aware of Norfolk's having "hallucinations or delusions" or whether he had observed Norfolk "talking to himself at any time." Over Norfolk's objection that the witness was "not qualified to talk about hallucinations and delusions," the court allowed Ogden to give his answer, "No." Finally, the State called Dr. Blaine Roffman, a forensic pathologist, who had performed the Jones autopsy and who testified that Jones' body had incurred numerous "contusions and abrasions," some superficial "stab wounds or lacerations," and "hemorrhages in the posterior portion of the pharynx and in the superior portion of the trachea and around the vocal chords." Based upon such observations, Dr. Roffman concluded that Jones died as a result of "[a]sphyxiation secondary to [manual] strangulation."

To support his insanity defense Norfolk called two psychiatrists, Dr. David Kentsmith and Dr. Bruce Gutnik, both of whom testified that Norfolk was in a psychotic state at the time of the Jones homicide, unable to differentiate right from wrong and unable to control his actions. Dr. Gutnik, in particular, testified that "for at least a period of 24 to 36 hours

in there, something was definitely very psychotic about this gentleman." To rebut testimony from Norfolk's psychiatrists, the State called Dr. Emmet Kenney, who expressed his opinion that Norfolk was able to distinguish right from wrong, was sane at the time of the homicide, and was "feigning" mental illness.

At the conclusion of all evidence, the district court found Norfolk guilty of first degree murder and, later, sentenced him to life imprisonment in the Nebraska Penal and Correctional Complex.

Norfolk claims three prejudicial errors occurred at trial: (1) The oral, nonrecorded custodial statement was improperly admitted into evidence; (2) The lay witness' testimony concerning Norfolk's "mental state" was improperly admitted as evidence; and (3) The evidence is insufficient as a matter of law to support a finding of guilt for first degree murder.

Norfolk's assertion of error in admitting into evidence his custodial oral statement has two aspects—deficiency in the warning required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and lack of voluntariness.

Norfolk contends that any apparent waiver of his right to remain silent resulted from his mistaken belief that a custodial oral statement was not "official," that is, a belief that an oral statement was not admissible as evidence to convict a defendant. To buttress his position, Norfolk emphasizes that as soon as he realized his statement being made during the tape-recorded interrogation was a part of the "official record," he requested a lawyer and demanded that the tape recorder be turned off. His actions during the tape-recorded interrogation, Norfolk argues, show his prior lack of appreciation that his oral statement would be evidence against him at trial. Norfolk, therefore, maintains that such circumstances preclude an intelligent waiver of his right to remain silent.

Before a defendant's custodial statement is admissible as evidence, the absolute and indispensable prerequisites of the *Miranda* warning must have been satisfied preceding the interrogation producing such statement, namely, law enforcement personnel must (1) inform the defendant of the right to remain silent, (2) explain that anything said can and will be used against the defendant in court, and (3) inform the

defendant of the right to consult with a lawyer and to have a lawyer present during interrogation. *Miranda v. Arizona, supra.* If a defendant to be interrogated is indigent, the defendant must also be informed that a lawyer will be appointed to represent the defendant. *Miranda v. Arizona, supra.* In *Miranda* the U.S. Supreme Court emphasized the need to protect integrity of a suspect's waiver and noted a waiver is not simply a "a preliminary ritual to existing methods of interrogation," but is "fundamental with respect to the Fifth Amendment privilege." *Miranda, supra* at 476. In stressing that a waiver must be knowingly and intelligently made, the U.S. Supreme Court has enunciated that when a custodial statement is obtained without the presence of a defendant's attorney, a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda, supra* at 475.

Any question involving an effective waiver of the *Miranda* rights necessarily involves consideration of two different problems—whether the waiver is the product of improper external influence on a defendant and whether a defendant possessed a certain degree of awareness or understanding regarding a right and a decision to forgo that right. Dix, *Waiver in Criminal Procedure: A Brief for More Careful Analysis*, 55 Tex. L. Rev. 193 (1977).

As far as our research indicates, the U.S. Supreme Court has not articulated a definition of *intelligence* in reference to a defendant's constitutionally acceptable waiver of a right regarding criminal prosecutions. Whether a defendant has "intelligently" waived the *Miranda* rights has frequently arisen in situations involving an alleged physical or mental condition preventing a defendant's comprehension of the *Miranda* warning administered by law enforcement personnel. In such cases, courts, examining all the circumstances surrounding an alleged waiver, have focused specifically on a defendant's ability to understand the rights designated in the *Miranda* warning and acknowledge such understanding by communication with an interrogator. For example, in *Fryer v. State*, 325 N.W.2d 400 (Iowa 1982), the defendant, possessing

an IQ in the "dull-normal range," contended that he lacked the requisite mental capacity to understand his rights and, thus, was incapable of waiving his rights. The Iowa Supreme Court rejected that contention, stating that "the facts and circumstances indicate that Fryer was *capable of understanding* and knowingly waiving his rights." (Emphasis supplied.) *Id*. at 409. Similarly, in *Howard v. State*, 458 A.2d 1180 (Del. 1983), the Delaware Supreme Court rejected the defendant's claim that his intoxication rendered his waiver ineffective, holding the defendant "had sufficient *capacity* to know what he was saying and to have voluntarily intended to say it." (Emphasis supplied.) *Id*. at 1183. In *State v. Finson*, 447 A.2d 788, 792 (Me. 1982), the Supreme Judicial Court of Maine stated the general proposition as follows: "A person [allegedly suffering from a mental deficiency] is not necessarily incapable of waiving his constitutional rights or giving a voluntary statement, if despite the [deficiency] he is aware and *capable of comprehending* and communicating with coherence and rationality." (Emphasis supplied.) See, also, *Moore v. Ballone*, 658 F.2d 218, 229 (4th Cir. 1981) (waiver not intelligent where State failed to establish that defendant was "capable of understanding his rights"); *Matter of Sanders*, 56 Or. App. 724, 643 P.2d 384, 387-88 (1982) (individual waiving right must possess " 'capacity to understand fully the nature of the right he is waiving . . .' "). In *State v. Lamb*, 213 Neb. 498, 505, 330 N.W.2d 462, 467 (1983), this court held a defendant's waiver to be effective where the defendant appeared to "know what he was doing" and "was capable of making voluntary and intelligent responses."

Norfolk does not argue that he suffered from a deficiency in mental capacity at the time of the waiver under examination. Such argument would not withstand the clear record in this case. Rather, Norfolk argues he was mistaken about the evidentiary value of his custodial oral statement to the interrogating officer. Generally, in situations where a defendant has claimed a mistake or misapprehension in the evidentiary value or effect of a custodial statement, courts have been less concerned with a defendant's construction or interpretation of the *Miranda* warning and more concerned whether an

interrogating officer has a duty to inform a defendant about consequences of a custodial statement.

In *Harris v. Riddle*, 551 F.2d 936 (4th Cir. 1977), for instance, the defendant made incriminating oral statements while in custody and after expressly waiving the *Miranda* rights. On appeal defendant claimed that at the time of his waiver "[h]e erroneously believed that an oral confession would not be harmful to him and could not be used against him." *Id.* at 938. After noting the defendant had thrice been advised of his *Miranda* rights, the Fourth Circuit Court of Appeals stated at 938:

> Yet it does seem likely that if Lt. Austin had said to Harris, "Look, you are making a mistake; what you tell me *will* be used against you even though I do not write it down and you do not sign it, and you do not have to shoot the gun to be guilty," such a warning would have been grasped and understood and perhaps heeded. But *Miranda* does not put upon the police the burden of explaining the rules of evidence and the substantive criminal law.

The court concluded that the defendant had made an "intelligent" waiver.

A misunderstanding about the evidentiary effect of an oral statement existed in *Wantland v. State*, 45 Md. App. 527, 413 A.2d 1376 (1980), where the defendant argued "he did not know that an *oral statement* could be used against him in court," which misunderstanding "precluded his having made a voluntary, knowing, and intelligent waiver." *Id.* at 535, 413 A.2d at 1382. The Maryland court was not persuaded by that argument and held:

> We decline to adopt the view that *Miranda* requires a waiver to be wisely made. Were we to follow that path, the police would be forced into the role of counsel for an accused. *Miranda* does not require that an accused be apprised of the evidentiary value of a statement.

*Id.* at 538, 413 A.2d at 1383. As expressed by the New York Court of Appeals: "Although a suspect must be apprised of his or her rights, providing a general legal education is not the business of the police or the courts." *People v. Williams*, 62 N.Y.2d 285, 289, 465 N.E.2d 327, 329, 476 N.Y.S.2d 788, 790

(1984). See, also, *State v. Wurm*, 32 Wash. App. 258, 647 P.2d 508 (1982); *Albright v. State*, 378 So. 2d 1234 (Fla. App. 1979); *Schilling v. State*, 86 Wis. 2d 69, 271 N.W.2d 631 (1978).

A requirement that a defendant comprehend the consequences of a custodial statement would impose a double duty in interrogation by law enforcement personnel—first, administration of the mandatory *Miranda* warning and, second, valid construction, as well as illustrative explanation, of the contents of the *Miranda* warning, including complete and accurate information bearing on the consummate consequence, namely, admissibility of the custodial statement as evidence at a defendant's trial. Imposing such burdensome responsibility on an interrogating officer would be unwise and impracticable. See, *Harris v. Riddle, supra* at 938 ("average interrogating police officer is not capable" of "explaining the rules of evidence and the substantive criminal law"); *Wantland v. State, supra* at 538, 413 A.2d at 1383 (questioning whether police were "qualified" to instruct the defendant "as to the effect of an oral statement *vis a vis* one that is written").

In reference to a waiver of the rights designated in the *Miranda* warning, *intelligent* is not synonymous with *prudent*, and intelligence is not equated with wisdom. See *Collins v. Brierly*, 492 F.2d 735 (3d Cir. 1974). In *United States v. Frazier*, 476 F.2d 891 (D.C. Cir. 1973), the court applied the "capacity" standard in response to the defendant's argument that misapprehension of an oral statement's effect rendered a waiver ineffective. The court found that the government had met its burden of proving an intelligent waiver by showing that the defendant "was *capable* of understanding" the *Miranda* warning. (Emphasis supplied.) *Id.* at 896. Recognizing that "even where capacity exists, it is sometimes true that understanding can be faulty or mistaken," *id.* at 897, the court in *Frazier* rebuffed the notion that a misunderstanding about consequences, by itself, provides a valid reason to exclude a defendant's custodial statement.

To determine whether a defendant acted intelligently regarding a waiver of any right designated in the *Miranda* warning, we hold that the proper standard is whether a defendant, at the time of the waiver, possessed the capacity to

understand and act in response to the *Miranda* warning given by an interrogating officer. 1 W. LaFave & J. Israel, Criminal Procedure § 6.9(b) (West 1984). By requiring such capacity as the determinant of an effective waiver, we ensure that the waiver requirement is not reduced to a "preliminary ritual to existing methods of interrogation." *Miranda v. Arizona*, 384 U.S. 436, 476, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In rejecting a requirement that a defendant must possess *actual* understanding of the consequences of a waiver after the *Miranda* warning, we avoid imposing upon the police the obviously impractical and unrealistic burden of supplying a legal interpretation of the *Miranda* warning and thus engendering the necessity of a case-by-case judicial determination of the length and breadth of an accused's actual comprehension of all consequences attendant to a custodial statement. Under all the circumstances of this case, the district court's finding, namely, that Norfolk's waiver, preceding his oral statement, was "intelligently" made, is not clearly wrong and cannot be set aside. See *State v. Hunt*, 212 Neb. 304, 322 N.W.2d 624 (1982).

Norfolk next maintains that his custodial statement was exacted by improper interrogation tactics, namely, Officer Wilson's deceptive reference to a nonexistent autopsy report concerning the victim, Jones, and the officer's suggestion that Norfolk would "feel better" if he would "tell us everything." Norfolk argues that such conduct rendered his statement involuntary and, hence, inadmissible at Norfolk's trial.

During the course of his interrogation, Norfolk acknowledged committing certain acts tending to prove the ultimate fact of his guilt for the Jones murder; thus, his various custodial statements constituted admissions. See *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985). The State bears the burden of proving that a defendant's statement was voluntarily made, before that statement is admissible as evidence against the defendant. See *State v. Joy*, 218 Neb. 310, 353 N.W.2d 23 (1984). In determining whether the State has satisfied its burden, a court examines the totality of the circumstances to ascertain whether the defendant's statement "is 'the product of a rational intellect and a free will.' " *State v.*

*Bodtke, supra* at 510, 363 N.W.2d at 922. A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless such determination is clearly erroneous. *State v. Hunt, supra.*

Officer Wilson's deliberately deceptive statement regarding the autopsy report is an interrogation tactic which may be inconsistent with popular notions about a professional and procedurally restrained police force and is a type of police practice which is, perhaps, infrequent. Nevertheless, the test for determining admissibility of a statement obtained by police deception is whether that deception *produced* a false or untrustworthy confession or statement. See, *State v. Erks*, 214 Neb. 302, 333 N.W.2d 776 (1983); *State v. Stevenson & Jackson*, 200 Neb. 624, 264 N.W.2d 848 (1978). Placed in the context of Norfolk's willingness to talk at the time of his arrest, the relative brevity of the interrogation, and the absence of other threatening or obviously coercive interrogation tactics, the isolated statement regarding the autopsy report does not appear to have produced a false or untrustworthy statement. Although a confession or statement to be admissible as evidence must not have been obtained as the result of "any direct or implied promises, however slight, nor by the exertion of any improper influence," *State v. Jones*, 208 Neb. 641, 646, 305 N.W.2d 355, 359 (1981), the officer's comment that Norfolk would "feel better" if he "would tell us everything" does not warrant overturning the district court's finding that Norfolk's statement was voluntarily made. Generally, "[a]n interrogation tactic in which the police appear to befriend the defendant" does not, by itself, render the confession involuntary. See *State v. Erks, supra* at 305, 333 N.W.2d at 779. Examining all the circumstances surrounding interrogation of Norfolk, the district court apparently concluded that the officer's attempt to "befriend" Norfolk did not improperly influence Norfolk's statement showing guilt for the Jones homicide. Cf. *State v. Erks, supra* (affirmance of the district court's decision to suppress confession where defendant, suspected of a sexual assault, was informed that confessing would protect himself and his family from public embarrassment). The district court's finding and determination

that Norfolk's statement was voluntarily made was not clearly erroneous and is, therefore, affirmed.

Norfolk claims the district court erred in allowing Carol Quiroz and Richard Ogden to testify with respect to whether Norfolk had, in their presence, experienced delusions or hallucinations. Norfolk relies upon *State v. Myers*, 205 Neb. 867, 869, 290 N.W.2d 660, 661 (1980), in which this court stated as follows:

"Nonexpert witnesses who have an intimate personal acquaintance with and an opportunity to observe the actions and demeanor of a person, before, at and after the time in question, may be permitted to testify as to his sanity or insanity when they have stated the primary facts which support their conclusion." [Citing *Torske v. State*, 123 Neb. 161, 242 N.W. 408 (1932).]

In *Myers* the nonexpert witness had "known the defendant for some 15 years, having observed the defendant in various emotional states." *Id.* at 869-70, 290 N.W.2d at 661. Norfolk claims that Quiroz and Ogden had no such "intimate personal acquaintance" with Norfolk and, thus, could not testify concerning his mental state.

Norfolk's argument fails to take into account the difference between the opinion testimony countenanced in *Myers* and the testimony adduced in the present case. In *Myers* the lay witness was allowed to testify that the defendant was not insane at the time he perpetrated the criminal act. In the case before us Quiroz and Ogden commented upon certain aspects of Norfolk's demeanor personally observed by those witnesses. Neither witness offered an opinion about Norfolk's sanity. Whatever degree and duration of personal contact may be sufficient to permit testimony about a defendant's sanity in accordance with *Myers*, the testimony adduced by the State from lay witnesses in the present case was not an opinion regarding Norfolk's sanity and, hence, does not fall within the ambit of the principle enunciated in *Myers*. See *People v Allen*, 90 Mich. App. 128, 282 N.W.2d 255 (1979) (rule governing admission of lay testimony as to sanity does not apply to a witness who simply describes defendant's manipulative character).

Since Quiroz and Ogden did not offer an opinion regarding Norfolk's sanity, but testified concerning their observations of Norfolk's conduct or behavior in terms of false perceptions or mistaken ideas, admissibility of such testimony is controlled by the personal knowledge requirement prescribed by Rule 602, Nebraska Evidence Rules. Neb. Rev. Stat. § 27-602 (Reissue 1979). See 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 602[03] (1985). In contrast to *State v. Myers, supra*, Rule 602 requires only that the proponent of the witness' testimony introduce evidence "sufficient to support a finding that [the witness] has personal knowledge of the matter." § 27-602. Ogden, as Norfolk's employer, and Quiroz, as an acquaintance and cotenant at Norfolk's apartment house, had sufficient personal knowledge to testify regarding Norfolk's conduct or behavior. A lay witness, when testifying on the basis of firsthand knowledge, can "relate specific objective observations of a person's conduct, condition or behavior," notwithstanding that such witness may not be allowed to offer his opinion as to the person's sanity. *Mason v. United States*, 402 F.2d 732, 738-39 (8th Cir. 1968). The admission or exclusion of evidence is a matter left largely to the sound discretion of the trial court, and its ruling will be upheld absent an abuse of discretion. See *Chmelka v. Continental Western Ins. Co.*, 218 Neb. 186, 352 N.W.2d 613 (1984). On the basis of the objection asserted by Norfolk, we find no abuse of discretion by the district court in admitting into evidence the testimony of Quiroz and Ogden.

Finally, Norfolk contends that there was insufficient evidence to support a finding that Norfolk had acted "purposely and with deliberate and premeditated malice" when he killed Jones. See § 28-303(1) (elements of crime of murder in the first degree). "It is the province of the Supreme Court, on appeal from a conviction, to refrain from resolving conflicts in the evidence and to sustain the judgment of conviction if, taking the view most favorable to the State, there is sufficient evidence to support the conviction." *State v. Craig*, 219 Neb. 70, 80, 361 N.W.2d 206, 214 (1985). In first degree murder cases where premeditation is an issue, there is a mental process involved,

namely, the subjective state of the perpetrator, which can be proved by circumstantial evidence. . . . Concerning the element of premeditation, "the time required may be of the shortest possible duration. The time may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed . . . ." [Citation omitted.]

*State v. Lynch*, 215 Neb. 528, 533, 340 N.W.2d 128, 132 (1983). Taking the view most favorable to the State, the record establishes through Norfolk's confession and the required corroborative evidence introduced by the State, see *State v. True*, 210 Neb. 701, 316 N.W.2d 623 (1982), that Norfolk obtained a butcher knife from Jones' kitchen, cut the cords of two telephones, entered Jones' bedroom, struck her, inflicted superficial stab wounds on her body, and manually strangled her to death. Such conduct represents circumstances from which the trier of fact could and did draw the inference that Norfolk, purposely and with deliberate and premeditated malice, killed Jones. We conclude there is sufficient evidence to sustain Norfolk's conviction of first degree murder.

The judgment of the district court is correct in all respects and is, therefore, affirmed.

AFFIRMED.