STATE OF NEBRASKA, APPELLANT, V. PETE COLEMAN, ALSO KNOWN AS RUFUS TWO TWO, APPELLEE.

419 N.W.2d 878

Filed March 4, 1988.    No. 87-896.

George G. Rhodes, Custer County Attorney, for appellant.

Brad Roth of Sennett & Roth, for appellee.

SHANAHAN, J.

Authorized by Neb. Rev. Stat. § 29-116 (Reissue 1985), the State appeals from an order of the district court for Custer County, suppressing an oral statement of Pete Coleman, also known as Rufus Two Two.

The county court for Custer County issued a warrant for the arrest of Pete Coleman, also known as Rufus Two Two, for three felony charges (burglary, terroristic threats, and theft) and one misdemeanor (second degree forgery). While on patrol and aware of the unserved arrest warrant for Coleman, Officer Larry Sanchez of the Broken Bow Police Department saw Coleman in a parked van and confronted Coleman with the fact that there was an outstanding warrant for Coleman's arrest. When Coleman asked about the nature of the charge reflected in the warrant, Officer Sanchez responded that he "was not aware of what the contents of the warrant were, that it would be best if he [Coleman] would come down to the police department and have it explained to him." In his cruiser, Sanchez took Coleman to the police station "to clear the matter of a warrant being served."

On arrival at the police station, Sanchez took a nervous Coleman to the "cop shop," a room used for booking and interrogation. Coleman was not free to leave Sanchez's custody while the pair awaited someone from the sheriff's department to serve the Coleman arrest warrant. In the course of their waiting, Coleman again asked Sanchez about the nature of the charge stated in the warrant. Sanchez's reply was:

> I don't know, I don't know the contents . . . but I stated to him, don't say anything that you don't want to be repeated. He acknowledged and said, okay. Waited for the warrant to be served and prior to the warrant being served to Pete he stated that, I don't understand why I am here but it must be because of those checks that I got from O'Brian that I forged.

Presumably, the O'Brian checks mentioned by Coleman relate to the forgery charge stated in the warrant for Coleman's arrest.

Coleman and Sanchez had no further conversations at the police station before a Custer County deputy sheriff arrived, served the arrest warrant on Coleman, and removed him to the sheriff's department. Throughout the time that Coleman was in Sanchez's custody, that is, from apprehension at the van until arrival of the deputy sheriff, Sanchez never gave Coleman the "*Miranda* warning." See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Coleman did not waive any of the rights reflected in the *Miranda* warning.

Coleman filed a motion to suppress his custodial oral statement to Sanchez. See Neb. Rev. Stat. § 29-115 (Reissue 1985). In his motion, Coleman alleged that his custodial statement to Sanchez was made without Coleman's "having been informed of his constitutional rights" and was "not freely and voluntarily given." At the hearing on Coleman's suppression motion, the district court remarked:

> Officer Sanchez, I am not necessarily disagreeing with what you said, it appears a better procedure would have been to advise Mr. Coleman immediately upon arrest of his Miranda rights, at the latest he should have been advised of his Miranda rights was when you got him to the station and at the very latest when he started making statements without knowing his rights at that particular time.
>
> Had you given his Miranda rights you would have had no problem with this or had you had him sign a waiver of his Miranda rights form and that is what those forms are for. I understand that sometimes you are rushed and you can't do all those things but in this situation it appears to me from the evidence that the statements were not voluntarily, intelligently made after advisement of the rights and they should be suppressed.

The court then entered its order suppressing Coleman's oral statement to Sanchez, including findings that Coleman "was being held without being advised exactly why he was being held and there was a question in the defendant's mind as to why he was being held without being notified of the specific reason";

that Coleman "should have been advised of his Miranda rights when he started making statements without knowing his rights at that particular time"; and that Coleman's statement was "not voluntarily and intelligently made after advisement of the rights."

First, the State claims that Coleman's oral statement was not the product of custodial interrogation and is, therefore, admissible without the *Miranda* warning from Officer Sanchez. Second, the State contends that Coleman's statement was made voluntarily, notwithstanding that Sanchez did not inform Coleman concerning the specific charge contained in the arrest warrant.

Coleman argues that police must administer the *Miranda* warning before express interrogation of a suspect and before words or actions by police, which are likely to elicit an incriminating response from the suspect. Also, Coleman argues that his ignorance of the specific charge rendered his oral statement involuntary.

"In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous." *State v. Copple*, 224 Neb. 672, 689, 401 N.W.2d 141, 154 (1987).

In *State v. Bodtke*, 219 Neb. 504, 508-09, 363 N.W.2d 917, 921 (1985), we stated:

> *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), formulated prerequisites for admissibility of a suspect's in-custody statement(s) obtained "in a police-dominated atmosphere, resulting in self-incriminating statements," *id*. at 445, and sought to minimize the psychological advantage frequently inherent in an exercise of governmental authority as a tool for coercion, that is, the "potentiality for compulsion." *Id*. at 457. "Custodial interrogation" has been characterized by the U.S. Supreme Court in *Miranda* as "questioning instigated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444.

To counter potentially coercive circumstances surrounding a

suspect's statement to police officers and as a prerequisite for admissibility of a suspect's in-custody statement, law enforcement personnel must inform the person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

According to the U.S. Supreme Court, a purpose of the *Miranda* warning is "preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-30, 107 S. Ct. 1931, 1936-37, 95 L. Ed. 2d 458 (1987).

> Before a defendant's custodial statement is admissible as evidence, the absolute and indispensable prerequisites of the *Miranda* warning must have been satisfied preceding the interrogation producing such statement, namely, law enforcement personnel must (1) inform the defendant of the right to remain silent, (2) explain that anything said can and will be used against the defendant in court, and (3) inform the defendant of the right to consult with a lawyer and to have a lawyer present during interrogation.

*State v. Norfolk*, 221 Neb. 810, 814-15, 381 N.W.2d 120, 125 (1986).

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), Innis was arrested for a robbery perpetrated with a sawed-off shotgun and received the *Miranda* warning before transportation to the police station. Police had not found the shotgun used in the robbery. While accompanying Innis to the station, officers talked among themselves concerning location of the shotgun and commented about the possible tragedy of a child's finding the loaded shotgun and receiving injury from that weapon. Innis interrupted the conversation and told the officers that, if they would return to the arrest scene, he would locate the shotgun for the police. At the scene, Innis led police to the missing shotgun. In considering whether Innis' actions in pointing out the shotgun were the

product of compulsion by the police, the U.S. Supreme Court stated:

The issue, therefore, is whether the respondent was "interrogated" by the police officers in violation of the respondent's undisputed right under *Miranda* to remain silent until he had consulted with a lawyer. In resolving this issue, we first define the term "interrogation" under *Miranda* before turning to a consideration of the facts of this case.

The starting point for defining "interrogation" in this context is, of course, the Court's *Miranda* opinion. There the Court observed that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *Id.*, at 444 (emphasis added). This passage and other references throughout the opinion to "questioning" might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody.

We do not, however, construe the *Miranda* opinion so narrowly. The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. *Id.*, at 457-458. The police practices that evoked this concern included several that did not involve express questioning. . . . The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society." *Id.*, at 450. It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.

This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. As the

Court in *Miranda* noted: " 'Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.* . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' *Id.*, at 478 [emphasis supplied in original]." It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to

words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. [Emphasis in original.]
446 U.S. at 298-302.

The U.S. Supreme Court, in *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), concluded that Innis was not interrogated within the meaning of *Miranda* and was not subjected to the "functional equivalent" of questioning. As expressed by the U.S. Supreme Court:

The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

446 U.S. at 303.

The Supreme Court of Nebraska has held that a "spontaneously volunteered statement" of a suspect or defendant is admissible in the absence of the *Miranda* warning. *State v. Red Feather*, 205 Neb. 734, 738, 289 N.W.2d 768, 771 (1980). See, also, *State v. Torrence*, 192 Neb. 213, 216, 219 N.W.2d 772, 774 (1974) (a suspect's oral statement, "spontaneous and voluntary in nature and not the result of interrogation," was admissible in the absence of the *Miranda* warning).

In Coleman's case, there was no interrogation which resulted in Coleman's oral statement about the forged checks. Officer Sanchez did not expressly question Coleman about any aspect of the offenses reflected in the warrant for Coleman's arrest.

Consequently, Coleman's oral statement, made while Coleman was in police custody, was not the product of express interrogation requiring the *Miranda* warning. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Officer Sanchez's conduct in transporting Coleman to the police station, as well as his conversation and actions while waiting with Coleman in the "cop shop" for Coleman's transfer to the sheriff's department pursuant to the arrest warrant, was not the functional equivalent of express interrogation, that is, conduct recognized by police as reasonably likely to elicit an incriminating response from Coleman. See *Rhode Island v. Innis, supra*.

The *Miranda* warning is not some constabulary intonation which must be expressed whenever police detain or take an individual into custody. See *Rhode Island v. Innis, supra* (the *Miranda* warning is not required "where a suspect is simply taken into custody." 446 U.S. at 300). A suspect's spontaneously volunteered statement in the absence of the *Miranda* warning, made while a suspect is in police custody, is not excluded from evidence as a contravention or violation of the constitutional protection against compulsory self-incrimination. See *Miranda v. Arizona, supra*. The three-part *Miranda* warning, see *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986), does not include a requirement that police inform a suspect or defendant of a charge against him or her, whether the charge is actual, probable, or merely possible. Such a requirement would compound confusion and exponentially expand errors contaminating an individual's custodial statement which is otherwise constitutionally admissible evidence.

Apart from the *Miranda* warning and its applicability in Coleman's case, there is another question in view of the trial court's findings: Is a defendant's statement, made in the defendant's ignorance of a specified offense, either suspected or charged, an involuntary statement and constitutionally inadmissible? Coleman emphatically answers "yes," but, unfortunately, provides no judicial opinion supporting an affirmative answer to the question.

The Supreme Court of Nebraska has considered the question about constitutional admissibility of a defendant's statement

concerning a crime different from that under investigation or charged against the defendant, when the defendant made the statement after receipt of the *Miranda* warning. See *State v. Comer*, 205 Neb. 549, 288 N.W.2d 487 (1980) (defendant arrested for possession of stolen property; *Miranda* warning given before interrogation in which defendant's statement implicated him in a sexual assault known to the police; held, defendant's statement about sexual assault was admissible).

*Colorado v. Spring*, 479 U.S. 564, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987), involved admissibility of a defendant's statement made after the *Miranda* warning. Spring and a companion shot and killed a Donald Walker in Colorado. An informant told federal agents that Spring was involved in the interstate transportation of stolen firearms and had discussed participation in the Colorado killing. After Spring's arrest and receipt of the *Miranda* warning, federal agents questioned Spring about the firearms transactions. During that questioning, Spring admitted that "I shot another guy once." When the federal agents asked whether he had been to Colorado and shot Walker, Spring answered "no." Later, after giving Spring the *Miranda* warning, Colorado law enforcement officials interrogated Spring, who was in jail on the federal firearms offenses. In that questioning Spring confessed to killing Walker and signed a statement summarizing the interview in which the confession was made. Spring also signed a written waiver of his rights described in the *Miranda* warning. The Colorado Supreme Court concluded that the federal agents' failure to inform Spring that he would be questioned about the Colorado homicide vitiated Spring's waiver of the rights reflected in the *Miranda* warning. The U.S. Supreme Court disagreed with the Colorado court and stated:

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *Moran v. Burbine, supra,* at 422; *Oregon v. Elstad, supra,* at 316-317 . . . .
>
> . . . .
>
> This Court's holding in *Miranda* specifically required

that the police inform a criminal suspect that he has the right to remain silent and that *anything* he says may be used against him. There is no qualification of this broad and explicit warning. The warning, as formulated in *Miranda*, conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it. Accordingly, we hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.

479 U.S. at 574, 577.

However, both *State v. Comer, supra,* and *Colorado v. Spring, supra,* involve a situation where the *Miranda* warning had been given and do not address the question whether, in the absence of the *Miranda* warning, law enforcement officers must inform a suspect or defendant concerning the nature of a particular offense, suspected or charged, before a defendant's statement pertaining to the offense may be characterized as voluntary. Whether a defendant's statement, made in the defendant's ignorance of a particular offense, suspected or charged, constitutes a voluntary statement is a question concerning the constitutional safeguard of due process. I am unable to find any decision of the Nebraska Supreme Court addressing the precise question. If such Nebraska decision exists, I believe that counsel would have referred, in oral argument or brief, to such authority. Even if decisions from other jurisdictions were unearthed, the question about voluntariness, as previously stated and a case of first impression, is more properly presented for consideration and response by the entire Supreme Court of the State of Nebraska.

Nevertheless, Coleman's oral statement, a volunteered expression, was not the product of police interrogation which must be preceded by the *Miranda* warning. The district court's finding, namely, that the *Miranda* warning was a prerequisite to the constitutional admissibility of Coleman's statement, is clearly erroneous. For the purpose of this appeal by the State, a defendant's statement, made in a defendant's ignorance of a particular offense, suspected or charged, constitutes a

voluntary statement and is constitutionally admissible evidence. Therefore, the district court's finding that Coleman's statement was involuntary is clearly erroneous.

The district court's judgment, suppressing Coleman's oral statement to Officer Sanchez, is reversed.

REVERSED.