STATE OF NEBRASKA, APPELLEE, V. ANTHONY L. HALCOMB, APPELLANT.

510 N.W.2d 344

Filed April 6, 1993.   Nos. A-92-108, A-92-109.

Thomas M. Kenney, Douglas County Public Defender, and Janine F. Ucchino for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

SIEVERS, Chief Judge, and HANNON and IRWIN, Judges.

SIEVERS, Chief Judge.

Anthony L. Halcomb was charged with first degree sexual assault upon two different 5-year-old girls, C.H. and K.F., pursuant to Neb. Rev. Stat. § 28-319(1)(c) (Reissue 1989). His trial was to the court, and he was convicted and found to be a mentally disordered sex offender. He was sentenced to not less than 10 nor more than 20 years' imprisonment in each case, with the sentences to run concurrently. Halcomb first assigns error in the failure of the trial court to suppress the statements he made to the police, claiming that the statements were not voluntarily or intelligently given because of coercion and Halcomb's affliction with multiple personality disorder. Second, he claims that the evidence is insufficient to sustain the convictions.

Halcomb was unemployed and drawing Social Security

payments because of a "learning disability," the nature or extent of which is not explained in this record. Halcomb served as a free babysitter for a number of children in the Amber Ridge apartment complex in Omaha. The sexual assaults took place in the summer of 1990 during these babysitting sessions.

In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support the verdict. *State v. Smith*, 240 Neb. 97, 480 N.W.2d 705 (1992). Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992).

The written police reports, including accounts of interviews with C.H., K.F., witnesses, and Halcomb by officers of the Omaha Police Division concerning the assaults on C.H. and K.F., were received into evidence. The parties stipulated that if the officers who had prepared the reports were called to testify, they would testify in accordance with the reports. In addition, a tape recorded statement by Halcomb was received into evidence. We discuss the sufficiency of the evidence first because our summary of the evidence will facilitate the discussion of the issues involving the admissibility of the statements and confession.

With respect to C.H., Halcomb's adult girl friend told the police officers that she had observed Halcomb touch C.H. in a sexual manner " 'many, many times.' " In his interview with the officers on September 7, 1990, Halcomb admitted digital and penile penetration of C.H., as well as a sexual attraction to children. With respect to K.F., the police reports reveal that she told her mother that Halcomb would lay her on the floor and "hump" her. The child told an officer that Halcomb " 'sticks out his stick and puts it in my peepee' " and that he had done so six times. When asked if Halcomb's " 'peepee' would go inside of hers," K.F. said no, but she also said that Halcomb would put his fingers inside of her. According to the child, Halcomb

threatened that she would be " 'dead meat' " if she told anyone. This child also related how Halcomb would have a 6-year-old male child for whom he also babysat lie on top of her and fondle her. When interviewed, this male child told the officers that he would be " 'pumping [K.F.]' at the same time TONY would be 'pumping [C.H.]' "

On September 6, 1990, Halcomb was interviewed by Officer Teresa Thorson. She determined that he had a high school diploma and had not ingested drugs or alcohol in the last 12 hours. Officer Thorson then gave Halcomb a standard *Miranda* rights advisory. Halcomb admitted doing the same things to both C.H. and K.F. With respect to K.F., he admitted placing his penis in her vagina three times and said that he had ejaculated. The police reports reflect that upon being advised of his arrest and that he would be placed in jail, Halcomb became extremely distraught.

At trial, Halcomb testified on his own behalf, stating that he did not recall talking to the police about the sexual assaults, that he did not recall making the statements, and that it was not his voice on the tape (admitting sexual penetration) which had earlier been played for the court. His trial testimony was that at the time of the statement he was on the medication Thorazine, which was never substantiated in any way.

Additionally, as part of the defense, Dr. Beverley Mead, a psychiatrist, testified that Halcomb has multiple personality disorder, a recognized mental illness, and that another personality calling himself "Oman" committed the assaults and then confessed. According to Dr. Mead, this personality most likely emerged in opposition to the strict Jehovah's Witness upbringing Halcomb had as a child. However, Dr. Mead admitted that "Oman" knew what he was doing and stated that during the time "Oman" was the dominant personality, Halcomb would be in a dissociated state and would be amnesic. The State disputed this testimony with the testimony of Dr. John Riedler, a psychiatrist, who offered the opinion that Halcomb did not fulfill the diagnostic criteria for the extremely rare condition of multiple personality disorder.

Also as part of the State's rebuttal evidence, the mother of one of the victims testified. She related that she had known

Halcomb for 5 years and that she had talked to him frequently. Her testimony was that in one of their discussions, she inquired about how he received his Social Security benefits and he told her "[y]ou have to be head smart in order to get over on the system. You go into a Social Security office and you act crazy, and then they give it to you. Have a doctor examine you and act crazy, and then they approve you for it . . . ."

In its decision, the district court found it unnecessary to determine whether Halcomb had multiple personality disorder at the time the crimes were committed because whether acting under the personality named "Oman" or some other, the person who committed these crimes was in fact Anthony Halcomb. Dr. Mead had testified that the existence of multiple personalities would not exonerate Halcomb from responsibility. Dr. Riedler's conclusion was that Halcomb "has a fictitious psychosis that mimics multiple personality or schizophrenia . . . ." Further, Dr. Riedler said that in his opinion, "This man is actively acting in a coherent, organized, self-serving manner in which he is trying to protect his interests and keep himself out of prison." Whether Halcomb had multiple personality disorder or not was for the trier of fact, but even if he did, Halcomb has cited to no authority, nor have we found any, holding that this condition precludes criminal culpability.

Given the basic standard that an appellate court does not retry factual disputes and views the evidence most favorably to the State, we conclude that the evidence was obviously sufficient to sustain the convictions if the trial court properly overruled Halcomb's motion to suppress and his trial objections to the custodial statements and confession.

Halcomb contends that the statements to the police officers and his confession should have been suppressed, as he claims they were not made pursuant to a knowing, voluntary, and intelligent waiver of his right against self-incrimination.

The determination by a trial court that a statement was not made voluntarily will not be disturbed on appeal unless clearly wrong. *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991). The Supreme Court in *Haynie* set forth a nonexhaustive list of potential considerations in determining the voluntariness of a statement in the context of inducements by prosecuting

authorities, which includes:

> whether (1) defendant is in custody at the time of the statement, (2) defendant is alone and unrepresented by counsel, (3) the promise or inducement is initiated by prosecuting officials as opposed to defendant or someone acting on his behalf, (4) defendant is aware of his constitutional and other legal rights, (5) the potentially incriminating statement is part of an abortive plea bargain, (6) the promise or inducement leading to the statement is fulfilled by prosecuting authorities, and (7) defendant is subjected to protracted interrogation or evidence appears on the record to show that coercion precludes the statement from being knowing and intelligent.

*Id*. at 487, 476 N.W.2d at 912.

In the case at hand, we can quickly dispose of considerations based upon plea bargains or other inducements, as Halcomb makes no claim of inducements being offered by the interrogating officers. Halcomb was voluntarily at the Omaha Police Division's central station at the time of the questioning and recorded statement, and at the conclusion of his statement, Halcomb was arrested. He was interviewed the following day, September 7, 1990, regarding C.H. Although Halcomb was unrepresented, on each of the three occasions when he was questioned, August 29, September 6, and September 7, an Omaha Police Division standardized rights advisory form was utilized. Halcomb was, therefore, advised of his right to remain silent, that what he said could be used against him, and that he had a right to counsel during questioning, including the right to have counsel appointed for him if he could not afford it. After being advised of those basic rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), Halcomb answered affirmatively on all three occasions to the question of whether he was willing to make a statement or talk with the officers. With respect to whether the interrogation was protracted, Halcomb's first interview, which was with Sgt. Michael Cavanaugh, began at 7:40 p.m. and ended at 8:25 p.m. This first interview and the resulting investigation led to the second victim, K.F., and on September 6, an interview by

Officer Thorson concerning K.F., with another officer present, began at 11:31 a.m. and concluded at 12:05 p.m. The final interview, on September 7, lasted 29 minutes, including making the tape recorded statement which took 10 minutes. We cannot characterize such interrogations as protracted.

Admittedly, during the interviews Halcomb shook, twitched, cried softly, wept profusely, and was also angry and hostile. However, the testimony shows that he often shakes and twitches. The officers were aware that Halcomb claimed to have a learning disability and that he was a Social Security recipient. Halcomb said that he was threatened with "something about prison" if he did not "testify." Finally, Halcomb contends that the voice on the tape was not his, citing Dr. Mead's testimony that Halcomb has multiple personality disorder, and that another personality, "Oman," committed the assaults and made the confession. As we understand Halcomb's argument, it is that the totality of these circumstances shows that the statements and confession were not the product of a free, rational, and voluntary decision by Halcomb. Halcomb does not claim that his multiple *Miranda* advisories were defective or that his waiver of the rights protected by *Miranda* was not knowingly and intelligently made. Rather, Halcomb raises the issue of voluntariness. The State has the burden of proving that the statements were voluntarily made and not the product of any promise or inducement. *State v. Haynie, supra.* We therefore examine the voluntariness of Halcomb's statements and confession, bearing in mind that the trial court's determination that they were voluntary will not be overturned unless clearly wrong.

The Supreme Court in *State v. Walker*, 242 Neb. 99, 493 N.W.2d 329 (1992), recently reiterated the rule that the necessity of proving the voluntariness of a defendant's statement is not obviated by the fact that he was at the police station voluntarily, was not under arrest, and had knowingly and intelligently waived *Miranda* rights prior to the interrogation or statement.

The test from *Walker* is that "[t]he statement will be involuntary if, considering all the circumstances, the officer's statements overbore the will of the defendant and caused him to confess." *Id.* at 104, 493 N.W.2d at 334 (citing *State v. Ray*, 241

Neb. 551, 489 N.W.2d 558 (1992)). In *Ray*, the court stated that "[a] defendant's statement is inadmissible only if the totality of the circumstances shows that the police offered the defendant a benefit in exchange for the statement." *Id.* at 562, 489 N.W.2d at 565.

No claim is made that the interrogating officers offered Halcomb any benefit, and the only coercion mentioned is that an officer said "something about prison" or that if Halcomb did not "testify" he would go to prison. The officers deny threatening Halcomb with prison if he did not talk with them, but Sergeant Cavanaugh stated that he could have said that imprisonment was a possible penalty for the offenses under investigation. The totality of the record is not convincing that Halcomb was subjected to oppressive or coercive police tactics.

The police are not required to act as a defendant's legal advisers, see *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986), but if they did state that imprisonment was a possible penalty, that information was accurate and avoids a claim of deception. However, "deception alone will not render the confession involuntary." *Walker*, 242 Neb. at 104, 493 N.W.2d at 334. Even if made by an officer, a single statement of "something about prison" if he did not "testify" would not be so coercive as to overbear the defendant's will in the context of the three separate voluntary sessions Halcomb had with the police after full advisement of his *Miranda* rights. If such a statement was made, it was at worse deceptive, which, although not sanctioned by the Supreme Court in *Walker*, is not enough to preclude a finding of voluntariness. The trial court could have concluded that Halcomb's statements were voluntary, and we cannot say from this record that such a conclusion is clearly wrong.

Although Halcomb claims a learning disability which generates his Social Security benefits, the record does not tell us the nature or extent of that disability, nor is there any evidence that this condition was such that he could not comprehend the questions asked and the import of his answers. In *Norfolk*, the Supreme Court said that the waiver of *Miranda* rights must be an intelligent waiver, but that intelligence is not synonymous with prudence, nor is an intelligent waiver the same as a wise

waiver. This reasoning has application here. The record is lacking in evidence which even suggests that Halcomb was intellectually deficient to the point that voluntariness was lacking. Proof that Halcomb was wise and prudent is not a precondition to the conclusion that his statements were voluntary.

We briefly address Halcomb's argument that emotional instability (which we take to mean Halcomb's shift from hostile and angry to sobbing and weeping) somehow prevents a finding of voluntariness. In *Walker*, the claim that the defendant was "under 'a lot of emotional stress' " was considered to be of little consequence. *Id.* at 103, 493 N.W.2d at 333. We take the same view here. We would expect that being investigated for these perverse crimes would cause a significant emotional reaction—if not remorse, then at least fear at the prospect of being held accountable.

Finally, we turn to the matter of the multiple personality disorder diagnosed by Dr. Mead. The testimony from Dr. Mead was that in his opinion, the crimes were committed by "an alternate personality" and the "best basis to determine that is the repeated protests of Anthony — of Tony Halcomb that he has no recollection of doing this. And he also had no recollection of making the confession, but obviously he did — or, at least, some personality within him did."

Dr. Mead testified that most likely that personality was "Oman," who sees himself as a demon and who had become an alternate personality to Halcomb when he was 7 years of age. Nonetheless, the doctor stated that if "Oman" did these acts, "he would certainly understand this was not something you were supposed to do." The evidence from Dr. Mead was also that the multiple personality disorder did not render Halcomb incompetent to stand trial.

With this background, we turn to the question of the extent to which mental illness obviates what is otherwise a voluntary statement or confession. The U.S. Supreme Court in *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), considered the admissibility of a confession made by a chronic schizophrenic who approached a uniformed police officer in downtown Denver, Colorado, stating that he had

murdered someone and wanted to talk about it. That uniformed officer immediately gave *Miranda* warnings to Connelly, to which Connelly responded that it was " 'all right' " and that he would talk to the officer because his conscience had been bothering him. 479 U.S. at 160. A homicide detective was called to the location. He repeated the *Miranda* warnings and then asked Connelly " 'what he had on his mind.' " *Id.* Connelly stated that he had come all the way from Boston, Massachusetts, to confess to the murder of Mary Ann Junta, whom he had killed in Denver during November 1982 (approximately 10 months earlier). Connelly took the officers to the exact murder scene and was arrested. The next morning, he began showing signs of confusion and disorientation and for the first time stated that " 'voices' " had told him that he was either to go to Denver and confess or commit suicide. 479 U.S. at 161.

The psychiatrist's interviews and examinations resulted in expert testimony that Connelly thought he was "following the 'voice of God' " and that in response to the command, he had approached the officer on the street and confessed. *Id.* According to the psychiatrist, Connelly was experiencing " 'command hallucinations' " which interfered with his " 'volitional abilities; that is, his ability to make free and rational choices.' " *Id.* However, the psychiatrist also testified that Connelly's illness did not impair his cognitive abilities and that Connelly understood the rights he had when the officer and the detective gave *Miranda* warnings to him. The lower court had suppressed the confession. The U.S. Supreme Court reversed, reaffirming the view that it is coercive governmental misconduct which is the key to analysis of claims that the Fifth Amendment privilege against compulsory self-incrimination has been violated when a confession is obtained. Although holding that each confession case turns on its own factors, in each case where there has been a finding of oppressive police conduct, "all have contained a substantial element of coercive police conduct." 479 U.S. at 164.

The Court in *Connelly* discussed the exclusionary rule, finding that its philosophical basis is to substantially deter future violations of the Constitution. In *Connelly*, the Court

said it would need to establish a "brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—" in order to find that there had been a violation of the Fifth Amendment which would justify exclusion. 479 U.S. at 166. The Court said that it would not require sweeping inquiries into the state of mind of a criminal defendant who has confessed, which inquiries are divorced from whether coercion is brought to bear on the defendant by the State. It was said that this is a matter governed by state standards for the admission of evidence rather than by a separate constitutional standard. The Court held:

> [C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. We also conclude that the taking of respondent's statements, and their admission into evidence, constitute no violation of that Clause.

479 U.S. at 167.

The U.S. Supreme Court in *Connelly* also considered the State's burden of proof when the defendant seeks to suppress a statement or confession claimed to be in violation of the *Miranda* doctrine. The holding was that the State need prove waiver only by a preponderance of the evidence, citing *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). It was determined that the Supreme Court of Colorado had erred by importing the notion of free will into the voluntariness of a waiver of *Miranda* rights. The bases of this holding were that the Fifth Amendment, upon which *Miranda* is based, protects from governmental coercion and that the Fifth Amendment is not concerned with moral and psychological pressures to confess which emanate from a source other than official coercion. The Court concluded by saying:

> *Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. Respondent's perception of coercion flowing from the "voice of God," however important or significant such a

perception may be in other disciplines, is a matter to which the United States Constitution does not speak.

*Connelly*, 479 U.S. at 170-71. We believe that *Connelly* is directly on point and mandates that we affirm the district court's admission of the statements and confession of Halcomb.

The defense theory is that the statements and confession were made by a personality known as "Oman" and not by Anthony Halcomb. Assuming for purposes of discussion that this is true, it makes no difference to the outcome. The action of a dissociated personality of Halcomb called "Oman" who has confessed to a crime is no different from the standpoint of legal analysis than Connelly's confession allegedly motivated by the "voice of God." In neither instance was official coercion used to secure a waiver of *Miranda* rights and the statements or confession which followed the waiver. It is official coercion which offends the Fifth Amendment and results in exclusion of otherwise relevant and important evidence. A confession which may result in some manner from multiple personality disorder is not the product of police coercion, and therefore, the exclusionary rule does not operate to keep that confession from the fact finder.

*State v. Grimsley*, 3 Ohio App. 3d 265, 444 N.E.2d 1071 (1982), is a multiple personality case where the disorder was offered as a defense for Robin Grimsley's conviction of driving while under the influence of alcohol. The evidence was uncontroverted that she had multiple personality disorder. Grimsley argued that she should not be convicted because her other personality, Jennifer, was in control on the day in question and that Jennifer has a drinking problem. Grimsley argued that the psychological trauma of a report of a lump on her breast caused her to dissociate into the personality of Jennifer, who was impulsive, angry, fearful, anxious, and had a drinking problem. The court rejected the argument that Grimsley could not be found criminally culpable because the acts were beyond the control of her primary personality, Robin, and therefore were involuntary. The Ohio court reasoned:

Assuming *arguendo* that the evidence was sufficient to establish such a complete break between appellant's

consciousness as Robin and her consciousness as Jennifer that Jennifer alone was in control (despite years of therapy), nevertheless the evidence fails to establish the fact that Jennifer was either unconscious or acting involuntarily. There was only one person driving the car and only one person accused of drunken driving. It is immaterial whether she was in one state of consciousness or another, so long as in the personality then controlling her behavior, she was conscious and her actions were a product of her own volition. The evidence failed to demonstrate that Jennifer was unconscious or otherwise acting involuntarily.

*Id*. at 268, 444 N.E.2d at 1075-76.

Although *Grimsley* deals with the actual conviction as opposed to the voluntariness of the confession, which faces us, we believe the analysis of *Grimsley* is equally applicable here. If we assume that "Oman" exists, did the crimes, and then confessed, it is nonetheless a voluntary confession. The law excludes confessions produced by police coercion, but those which are produced in whole or in part by the various permutations of Halcomb's personality are still admissible. Similarly, the law holds Halcomb responsible for his actions against these children because he and he alone committed the acts and because there is no evidence in this record which would legally excuse him or serve as a defense.

Accordingly, the district court was not clearly wrong in its admission of the statements and confession. The evidence is obviously sufficient to support the convictions.

AFFIRMED.