On Return to Remand
 

 WELCH, Presiding Judge.
 

 Bruce Antonio Wilkerson appeals the circuit court’s denial of his Rule 32, Ala. R.Crim. P., petition for postconviction relief, in which he attacked his 2004 conviction for murder made capital because it was committed during a robbery and his resulting sentence of life imprisonment without the possibility of parole. This Court affirmed Wilkerson’s conviction and sentence in an unpublished memorandum issued on May 19, 2006.
 
 Wilkerson v. State
 
 (No. CR-04-0531), 978 So.2d 72 (Ala. Crim.App.2006) (table). The Alabama Supreme Court, after initially granting cer-tiorari review, quashed the writ, and this Court issued a certifícate of judgment on August 31, 2007.
 

 Wilkerson filed his petition on June 16, 2008, raising numerous claims of ineffective assistance of counsel. On August 20, 2008, he filed an amendment to his petition raising an additional claim of ineffective assistance of counsel. After receiving a response from the State, accepting depositions, and conducting an evidentiary hearing, the circuit court denied Wilkerson’s petition on July 20, 2009.
 
 [1]
 
 By order dated September 17, 2010, this Court found that the circuit court had erred in finding one of Wilkerson’s claims of ineffective assistance of counsel to be barred by Rule 32.2(a)(3) and (a)(5) (see Part I.B. of this opinion), and we remanded this case for the circuit court to issue specific written findings of fact regarding that claim. The circuit court complied with our instructions and issued a supplemental order on September 29, 2010.
 

 Wilkerson reasserts on appeal the majority of the claims of ineffective assistance of counsel raised in his petition. He also argues on appeal that the circuit court erred in finding some of his claims to be barred by. various provisions in Rule 32.2(a) (Issue I in Wilkerson’s brief) and requests that this Court remand this case for the circuit court to issue specific findings of fact regarding those claims (Issue II in Wilkerson’s brief). We address these arguments in conjunction with the claims of ineffective assistance of counsel to which they apply.
 

 
 *448
 
 For a better understanding of Wilkerson’s ineffective-assistance-of-counsel claims, we note the following procedural history, gleaned both from the record from Wilkerson’s direct appeal
 
 [2]
 
 and from the Rule 32 proceedings.
 

 On September 11, 2002, Wilkerson was arrested on an outstanding juvenile pickup order and was questioned about the murder of Donald Williams that had occurred two days earlier, on September 9, 2002. Wilkerson, who was 17 years old at the time, invoked his juvenile Miranda
 
 [3]
 
 right to have his father, Johnny Wilkerson (hereinafter “Johnny”) present and, after Johnny arrived, Wilkerson gave a statement denying any participation in the murder. Johnny then invoked Wilkerson’s right to counsel, questioning ceased, and on September 12, 2002, Johnny hired attorney Tom Radney to represent Wilkerson. Jason Jackson, a former police officer and a law student at the time who worked at Radne/s law firm as a law clerk and investigator, met Johnny and obtained a retainer, and then met with Wilkerson at the juvenile-detention facility where he was being held.
 

 The following morning, on September 13, 2002, a juvenile-detention hearing was held, at which Radney represented Wilkerson. After discussions with the prosecutor, Radney advised Wilkerson to cooperate with the police in the murder investigation. That afternoon, Wilkerson was again questioned by police, with Jackson present, and confessed to his participation in the murder. Radney continued representing Wilkerson for four months, during which time he was continually engaged in negotiations with tile prosecutor regarding Wilkerson’s case.
 

 In January 2003, Johnny retained attorney Tim Davis, and Radney filed a motion to withdraw on January 23, 2003. A hearing was held on February 5, 2003, during which Davis filed his notice of appearance “for the limited purpose of representing [Wilkerson] in entering a guilty plea.” (Record on direct appeal, C. 19.) The trial court granted Radney’s motion to withdraw on February 11, 2003. Plea negotiations apparently broke down, and in September 2003, at Davis’s request, the trial court appointed Davis and attorney Charles Gillenwaters to represent Wilkerson. Davis and Gillenwaters represented Wilkerson through his November 2004 trial for capital murder and his sentencing hearing. On November 22, 2004, four days after Wilkerson was sentenced, Davis and Gillenwaters moved to withdraw. On December 27, 2004, after a hearing on December 16, 2004, at which Davis and Gillenwaters orally moved for a new trial, the trial court issued an order granting the motions to withdraw and denying the oral motion for a new trial. On December 29, 2004, the trial court appointed Jeremy Armstrong to represent Wilkerson on appeal. The record on appeal was certified as complete on March 3, 2005.
 

 In our unpublished memorandum affirming Wilkerson’s conviction and sentence, this Court set out the evidence at trial as follows:
 

 “The State’s evidence at trial tended to show that shortly after 10:00 p.m. on September 9, 2002, Rusty Dean heard a car at the Opelika Floral shop. He went
 
 *449
 
 outside and saw a beige or brown, older-model Chevrolet Caprice pull out, turn right, and stop. He then heard a gunshot and saw a black male run to the car and jump into the back passenger seat. The driver, a black male, drove away, and Dean called the police. A neighbor, Virginia Honnell, told investigating officers that she heard a ‘loud pop’ and voices a little after 10:00 p.m. She went outside and saw two young males dressed in dark shirts run to a parked, older-model car. The taller one got into the car, and the car began to pull away. The shorter one then got into the back of the car, and the car drove away. Honnell said that the shorter male appeared to be holding his mouth. Officers checked the neighborhood and found a man lying unconscious in the open doorway of a nearby residence. The man, Donald Williams, was pronounced dead by paramedics who reported to the scene. An autopsy subsequently revealed that Williams had died from a gunshot wound to the chest. Officers testified that the victim had two small cuts on his fingers and that two buttons appeared to be missing from his shirt. Officers found one plastic button on the front porch and another underneath Williams’s body. A search of the residence revealed an overturned speaker inside the front door, a flower pot lying next to the speaker, and a bullet fragment on the den floor. Officers also found approximately $400.00 in cash in plain view in one of the rooms and approximately $600.00 in cash in the victim’s pocket. Outside the house, they found a blood spot on the front steps and a spent shell casing on the ground to the right of the front door. DNA analysis revealed that the blood on the front porch was Wilkerson’s. His blood also was found inside his car and on a white T-shirt in a garbage can at his home. Police also found a semi-automatic rifle and bullets at Wilkerson’s house. Wilkerson was apprehended after police asked school officials to report any students who had suffered an injury. The principal reported Wilkerson because he missed school on September 9 and he had an injury to his mouth. Wilkerson’s lip was stitched when he was apprehended.
 

 “The State also offered evidence of an offense that had occurred in Auburn earlier the same evening. Marilyn Swyers testified that at about 9:30 p.m., two young black males opened the front door of her house and entered the living room. The shorter one did not say or do anything, but the taller one began waving a gun around and threatening to kill her husband, who was sleeping in a chair. When her husband awoke and began backing away, the gunman shot him in the chest. Both intruders fled; and the Swyerses’ daughter, who had been in the bedroom, called the police. Mrs. Swyers identified Wilkerson in court as the shorter intruder, and she identified Lamar Charles Robinson from photographs as the taller intruder. She also identified a purple shirt found at Wilkerson’s residence as similar to the one worn by the shorter intruder. Police subsequently interviewed Robinson at a correctional facility in North Carolina, and he denied participating in either crime. Before he could be returned to Alabama, Robinson hanged himself.
 

 “On September 11, 2002, police picked up Wilkerson; and he gave them a statement. Wilkerson said that on September 9, he stayed home from school, sick. That night, he visited a friend, Lamarcus Harris. He fell as he was leaving Harris’s residence shortly after 10:00 p.m. and cut his lip. The next
 
 *450
 
 morning, his mother took him to the doctor to have it stitched. Police subsequently discovered discrepancies in Wilkerson’s statement. On September 13, they interviewed him a second time; and Wilkerson admitted that he had participated in both of the shootings on September 9. Wilkerson said that at about 4:30 p.m., he drove to the home of a friend, Laregis Ferrell, in his mother’s car. He, Laregis, and a man named ‘Lamar’ went to visit a friend and then talked in Laregis’s yard. Lamar said that he needed money, and the three of them agreed to commit a robbery. Wilkerson took his mother’s car home and returned in his own brown, four-door 1977 Chevrolet Impala. The three of them then drove to Auburn, where Lamar selected a house to ‘rob.’ Wilkerson said that Lamar was armed with a rifle and some bullets, which he placed into the glove compartment. Lamar and Wilkerson approached the house, leaving Laregis in the car. They entered the house and found a woman sitting at a desk and a man sleeping in a chair. Lamar began yelling and asking for money, and the man awoke and began to crawl away. Lamar fired one shot at the man, and Wilkerson fled. Lamar followed him to the car, and they drove back to Opelika. After a brief stop at Laregis’s home, they drove to a house near the recreation center to attempt another robbery. Wilkerson knocked on the door while Lamar remained at the bottom of the stairs with the gun. An older, white male opened the door and then suddenly hit Wilkerson in the mouth with his fist. Lamar shot the man, and Wilkerson and Lamar ran back to the car. They drove to a dirt road near Wilkerson’s house and waited until his mother left for work. Wilkerson then put the purple shirt he was wearing into his dresser and the bloody T-shirt he had used on his lip into the trash. He also hid the gun and the bullets from the glove compartment. The next morning, he told his mother that he had cut his lip falling off a friend’s porch, and she took him to have his lip stitched. At the end of his statement, Wilkerson admitted that the gun used in the shooting was his, not Lamar’s, and that he had brought it with him, loaded, when he returned to Lare-gis’s residence with his car.”
 

 In
 
 Strickland, v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court articulated two criteria that must be satisfied to show that counsel rendered ineffective assistance. A defendant has the burden of showing (1) that his counsel’s performance was deficient and (2) that that deficient performance actually prejudiced the defense. “To meet the first prong of the test, the petitioner must show that his counsel’s representation fell below an objective standard of reasonableness. The performance inquiry must be whether counsel’s assistance was reasonable, considering all the circumstances.”
 
 Ex parte Lawley,
 
 512 So.2d 1370, 1372 (Ala.1987). “ ‘This court must avoid using “hindsight” to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.’ ”
 
 Lawhorn v. State,
 
 756 So.2d 971, 979 (Ala.Crim.App.1999) (quoting
 
 Hallford v. State,
 
 629 So.2d 6, 9 (Ala.Crim.App.1992)). “A court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
 
 Strickland,
 
 466 U.S. at 689. As the United States Supreme Court explained:
 

 “Judicial scrutiny of counsel’s performance must be highly deferential. It
 
 *451
 
 is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
 

 Strickland,
 
 466 U.S. at 689 (citations omitted). To prove prejudice, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 466 U.S. at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 “It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.” 466 U.S. at 693.
 

 “The burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State.”
 
 Davis v. State,
 
 9 So.3d 514, 519 (Ala.Crim.App. 2006), rev’d on other grounds, 9 So.3d 537 (Ala.2007). “[I]n a Rule 32, Ala. R.Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence.”
 
 Wilson v. State,
 
 644 So.2d 1326, 1328 (Ala.Crim.App.1994). Rule 32.3, Ala. R.Crim. P., specifically provides that “[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.” “[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.”
 
 Ex parte White,
 
 792 So.2d 1097, 1098 (Ala.2001). “However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.’ ”
 
 Boyd v. State,
 
 913 So.2d 1113, 1122 (Ala. Crim.App.2003) (quoting
 
 Elliott v. State,
 
 601 So.2d 1118, 1119 (Ala.Crim.App. 1992)).
 

 With these principles in mind, we now address each of Wilkerson’s claims in turn.
 

 I.
 

 In Claim I in his petition, Wilkerson alleged: (a) That pretrial-counsel Radney was ineffective for allowing him to waive his rights and to confess to his participation in the murder without first having in place a plea agreement with the State (Issue V in Wilkerson’s brief); and (b) that trial counsel Davis and Gillenwaters were ineffective for not presenting sufficient evidence at the hearing on the motion to suppress his confession to show that his waiver of his
 
 Miranda
 
 rights, his confession, and his family’s cooperation in assisting the police in finding the murder weap
 
 *452
 
 on
 
 [4]
 
 were involuntary and would not have occurred but for their mistaken belief that Radney’s investigator, Jason Jackson, who was the only person present with Wilkerson when he confessed and who allegedly advised Wilkerson’s family to cooperate regarding the murder weapon, was an attorney when, in fact, he was not. (Issue III in Wilkerson’s brief.)
 

 A.
 

 With respect to Wilkerson’s challenge to pretrial-counsel Radney’s assistance, the circuit court found the claim to be merit-less because “there is no requirement in law or ethics, nor any professional responsibility to obtain a concession from the State before allowing a client to make a statement.” (C. 501.) The court further found:
 

 “According to the testimony given by Hon. Tom Radney at his deposition, his decision to allow [Wilkerson] to make a statement to the police was a strategic one based on the severity of the case and the facts as known by Mr. Radney at the time. The Court finds that Mr. Radney’s advice to [Wilkerson] was based on the fact that Mr. Radney believed the State would seek the death penalty against his client, and that Mr. Radney believed that cooperation with the State was in the best interests of his client despite not having an agreement finalized.
 

 “... Since Mr. Radney believed that the State would seek the death penalty upon originally taking the case, his advice may have been quite effective in achieving a sentence of life without parole due to his client’s cooperation.”
 

 (C. 501-02; footnote omitted.)
 

 Initially, we note that, although not found by the circuit court, the State correctly argued in its response to the petition, and correctly argues on appeal, that this claim was barred by Rule 32.2(a)(3) and (a)(5), because it could have been, but was not, raised and addressed at trial and on appeal. Although generally claims of ineffective assistance of counsel may be raised for the first time in a Rule 32 petition, see, e.g.,
 
 Johnson v. State,
 
 989 So.2d 1165 (Ala.Crim.App.2007), this is not a typical claim of ineffective assistance of counsel. The claim raised here is a claim of ineffective assistance of
 
 pretrial
 
 counsel, who represented Wilkerson for only four months after his arrest. As noted above, Wilkerson’s trial counsel, Davis and Gillen-waters, began representing Wilkerson in January 2003, some 22 months before Wilkerson’s trial and sentencing in November 2004, and could have easily raised a challenge to Radney’s effectiveness at any time during those 22 months, during the trial, or even in the postjudgment motion for a new trial. Only when a claim of ineffective assistance of counsel “cannot reasonably be presented in a new trial motion” may that claim be presented for the first time in a Rule 32 petition.
 
 Ex parte Ingram,
 
 675 So.2d 863, 866 (Ala. 1996). See also Rule 32.2(d) (“Any claim that counsel was ineffective must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable.”).
 

 Moreover, even if this claim were not barred, we agree with the circuit court that the claim is meritless, for two reasons. First, Wilkerson’s claim in this regard is based on his right to counsel under the Sixth Amendment to the United States Constitution. The Sixth Amend
 
 *453
 
 ment provides, in relevant part, that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” The Sixth Amendment right to counsel includes the right to the effective assistance of counsel. See, e.g.,
 
 Lane v. State,
 
 [Ms. CR-05-1443, February 5, 2010] — So.3d -, - (Ala.Crim.App.2010) (“Comprehended within the Sixth Amendment right to assistance of counsel is the right to the effective assistance of counsel.”). However, the Sixth Amendment right to counsel does not attach until adversarial proceedings have begun. See, e.g.,
 
 United States v. Gouveia,
 
 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984), and the cases cited therein. In this case, the record clearly establishes that, at the time Radney advised Wilkerson to cooperate and Wilkerson confessed to the murder, no adversarial proceedings
 
 regarding the murder
 
 had been initiated. Wilkerson had not been arrested or charged in relation to the murder. Rather, he was in custody on an unrelated juvenile pick-up order. See
 
 McNeil v. Wisconsin,
 
 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (holding that “[t]he Sixth Amendment right [to counsel] ... is offense specific” and the attachment of the right to counsel applies only to the offenses upon which a prosecution has commenced). Therefore, because Wilkerson’s Sixth Amendment right to counsel had not yet attached with respect to the murder when Wilkerson received the advice from Radney and confessed to the murder, he could not have been denied that right. See, e.g.,
 
 Evitts v. Lucey,
 
 469 U.S. 387, 396 n. 7, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (“[T]he right to effective assistance of counsel is dependent on the right to counsel itself.”).
 

 Second, even assuming that Wilkerson’s Sixth Amendment right to counsel had attached at the time of Radney’s advice and Wilkerson’s confession, we agree with the circuit court that Radney did not render ineffective assistance. At his deposition for the Rule 32 proceeding, Radney testified that he advised Wilkerson to cooperate with the police and that this advice was based on his knowledge of the facts of the case at that time. Specifically, Radney said that when he advised Wilkerson to cooperate, he and Jackson had both spoken with Wilkerson and with Johnny and that he knew what evidence the State had against Wilkerson. He also testified that he believed it was “the worst case [he] had ever had,” and that the State “had so much evidence” that he believed cooperation by Wilkerson was the best course of action. (C.Supp.42.) Radney, who had had two strokes since he represented Wilkerson, testified that he could not remember all the details of his representation of Wilkerson but that he had testified at the pretrial hearing on Wilkerson’s motion to suppress the confession and that he stood by his testimony at that hearing.
 

 At the pretrial hearing on the motion to suppress, Radney testified that he had represented Wilkerson at the juvenile-detention hearing and that, after the hearing, he had approached the prosecutor about a deal in exchange for Wilkerson’s cooperating in the murder investigation. Radney said that the prosecutor agreed not to seek the death penalty if Wilkerson cooperated with the police and that he then spoke with Wilkerson and told him about the prosecutor’s offer and advised him to cooperate and give a statement. Radney testified at the hearing, as he did in his deposition, that this was the worst case he had ever seen in practicing law for over 40 years and that his goal in advising Wilkerson to cooperate was to save Wilkerson from the death penalty.
 

 “Whether or not to recommend making a statement is a strategic decision
 
 *454
 
 which is only deficient if it is unreasonable ‘from counsel’s perspective at the time’ he made the recommendation.”
 
 Smith v. Rogerson,
 
 171 F.3d 569, 572-73 (8th Cir. 1999) (quoting
 
 Strickland,
 
 466 U.S. at 689). Under the circumstances in this case, we cannot say that Radney’s advice to Wilkerson to cooperate and to give a statement to police was unreasonable from Radney’s perspective at the time. At the time Rad-ney gave the advice, Wilkerson was eligible for the death penalty for his role in the murder of Donald Williams.
 
 [5]
 
 Radney was aware of Wilkerson’s involvement in the murder with two other individuals and testified that the State had a lot of evidence against Wilkerson.
 
 [6]
 
 In addition, contrary to Wilkerson’s assertion (and the circuit court’s finding in its order), the record clearly shows that there was, in fact, an agreement in place with the prosecutor when Radney advised Wilkerson to cooperate. Radney testified that, in exchange for Wilkerson’s cooperation, the prosecutor agreed not to seek the death penalty against Wilkerson. Although Radney and the prosecutor did not reduce the agreement to writing, Radney said that the prosecutor had “never lied to [him,] and [he] took his word for it.” (Record on direct appeal, R. 137.) And, indeed, the record reflects that both parties adhered to the agreement — Wilkerson cooperated with the police in the investigation by eon-fessing to his participation in the murder and naming the two other individuals involved, and the State did not seek the death penalty against Wilkerson at his capital-murder trial.
 
 [7]
 

 Wilkerson presented no evidence at the Rule 32 proceedings to overcome the presumption that Radney’s advice to him to cooperate was anything other than a sound strategic decision based on the circumstances known to him at the time. “Matters of trial tactics and strategy which can be a matter of endless debate by experienced advocates are not grounds for postconviction relief.”
 
 Knappenberger v. State,
 
 283 Ark. 210, 213, 672 S.W.2d 54, 56 (1984) (holding that counsel was not ineffective for advising petitioner to confess his involvement in the crime to the police). Therefore, the circuit court properly denied this claim.
 

 B.
 

 With respect to Wilkerson’s challenge to Davis’s and Gillenwaters’s assistance at the suppression hearing, the circuit court initially found this claim to be barred by Rule 32.2(a)(3) and (a)(5). We agreed with Wilkerson’s argument on appeal that this claim was not barred by Rule 32.2(a)(3) and (a)(5), and, as noted above, we remanded this case by order for the circuit court to issue specific findings of fact regarding this claim. In its supplemental
 
 *455
 
 order on remand, the circuit court found this claim to be meritless because “[a]ll witnesses who would conceivably have had relevant testimony as to the suppression of the statement were called at the suppression hearing[,]” including the law-enforcement officers who interviewed Wilkerson on September 11, 2002, and September 13, 2002, Radney, Jackson, and Wilkerson himself. (Record on return to remand, C. 4.)
 

 In his petition, Wilkerson made numerous allegations regarding what he believed Davis and Gillenwaters should have done, but did not do, at the hearing on the motion to suppress his confession. The crux of all of his allegations, however, was simply that Davis and Gillenwaters were ineffective for not presenting sufficient evidence and argument at the suppression hearing to establish that Wilkerson mistakenly believed that Jackson was an attorney and that this mistaken belief rendered Wilkerson’s waiver of his juvenile
 
 Miranda
 
 rights and his subsequent confession to the murder involuntary. Wilkerson maintained in his petition, as he does on appeal, that had trial counsel presented sufficient evidence of his mistaken belief, the trial court would have suppressed his confession. We disagree.
 

 The record from Wilkerson’s direct appeal reflects that Davis and Gillenwaters moved to suppress Wilkerson’s September 13, 2002, confession, in part, on the ground that Wilkerson did not voluntarily waive his juvenile
 
 Miranda
 
 rights and did not voluntarily confess because he mistakenly believed that Jackson, who was the only person present with Wilkerson when he confessed, was an attorney. Specifically, Davis and Gillenwaters argued that both Wilkerson and his entire family were misled into believing that Jackson was an attorney and that, therefore, Wilkerson was effectively denied his right to counsel and could not have knowingly and voluntarily waived his right to counsel. The transcript of the suppression hearing supports Wilkerson’s assertion in his petition that his trial counsel failed to present any evidence to support this ground of the motion to suppression, i.e., no evidence was presented that Wilkerson mistakenly believed that Jackson was an attorney.
 

 Davis and Gillenwaters called Wilkerson to testify on his own behalf at the suppression hearing, but asked him only a single question: “[D]id you ever receive from Tom Radney advice to give a statement or to cooperate with the authorities?” (Record on direct appeal, 211.) Wilkerson responded in the negative. However, Davis and Gillenwaters did not question Wilkerson regarding his belief as to Jackson’s status as an attorney, and no testimony to that effect was brought out on cross-examination of Wilkerson by the prosecutor. Davis and Gillenwaters also attempted to call Wilkerson’s mother, Juanita Wilkerson (hereinafter “Juanita”), to testify at the suppression hearing, but because she had entered the courtroom during Wilkerson’s testimony in violation of the trial court’s order of sequestration of witnesses, the trial court did not allow Juanita’s testimony. Davis and Gillenwaters then proffered that Juanita’s testimony would establish that “it was represented to [Wilkerson’s] family that Jason Jackson was an attorney” and that “[o]n more than one occasion Mr. Jackson represented to the family members that he was an attorney.” (Record on direct appeal, R. 218.) On appeal, in upholding the trial court’s decision to exclude Juanita’s testimony, this Court noted that the proffer about Juanita’s testimony was not sufficient to indicate that Wilkerson mistakenly believed that Jackson was an attorney because it did not include any claim that Wilkerson’s family had told him about the alleged misrepresentations made by Jackson to Wilkerson’s
 
 *456
 
 family. Simply put, the record from Wilkerson’s direct appeal reflects that Davis and Gillenwaters failed to present any evidence to establish that Wilkerson mistakenly believed that Jackson was an attorney.
 

 However, we do not find this failure to constitute ineffective assistance of counsel. At the suppression hearing, the State presented the following testimony. Ben Bugg, an investigator with the Opeli-ka police department, testified that he responded to the scene of Donald Williams’s murder; that he noticed a cut on Williams’s left hand suggesting that Williams may have hit something or someone during a struggle; that he received information that the perpetrators were young black males; and that he notified local schools that he was looking for someone who had an injury. Bugg further testified that one of the schools contacted him about Wilkerson, who had missed school and had an injury to his mouth. After investigating Wilkerson, Bugg discovered an outstanding juvenile pick-up order for Wilkerson, and other Opelika police officers arrested Wilkerson the evening of September 11, 2002, and brought him to the police department. Bugg testified that, although Wilkerson was initially arrested on the juvenile pick-up order, he told Wilkerson that he was a suspect in a murder case and that Bugg wanted to question him about the murder case. Bugg said that Wilkerson told him that he had completed the 11th grade and that he could read and write and understood English. Bugg then advised Wilkerson of his juvenile
 
 Miranda
 
 rights, and Wilkerson indicated that he understood his rights and that he was willing to make a statement, but that he wanted his father present. Bugg contacted Johnny, who came to the police department. Bugg readvised Wilkerson of his juvenile
 
 Miranda
 
 rights in Johnny’s presence, and Wilkerson orally agreed to waive his rights, but refused to sign a waiver-of-rights form. Bugg stated that he did not offer Wilkerson any reward or threaten Wilkerson in order to obtain a statement. Wilkerson then gave a statement, reduced to writing by Bugg. Following the statement, Wilkerson was ordered to be transported to the Lee County Youth Development Center, still in custody on the juvenile pick-up order.
 

 Lee Hodge, a detective corporal with the Auburn police department, testified that at the same time Wilkerson was giving his statement to Bugg, a search warrant was being executed at Juanita’s home, where Wilkerson resided. Based on evidence obtained at Juanita’s home, including bullets, Wilkerson, who was at that time en route to the juvenile facility, was brought back to the Opelika police department. Det. Hodge testified that he informed Wilkerson, in the presence of his father, Johnny, that bullets were found at Juanita’s house but that no corresponding weapon was found. Det. Hodge said that Wilkerson then “teared up, and dropped his head and shook his head” and that Johnny then invoked Wilkerson’s right to counsel and all questioning ceased. (Record on direct appeal, R. 127.)
 

 Radney testified at the suppression hearing that after Johnny hired him to represent Wilkerson he sent Jackson to the juvenile-detention facility to speak with Wilkerson. He also said that the day of the juvenile-detention hearing, he approached the prosecutor about a deal, and the prosecutor agreed not to seek the death penalty against Wilkerson if he cooperated with the police in the murder investigation. Radney stated that he fully advised Wilkerson and Johnny regarding Wilkerson’s rights at the juvenile-detention hearing, as well as his rights relating to the murder case, such as his right to a
 
 *457
 
 trial by jury and that he advised Wilkerson to cooperate. Radney said that after this discussion, Wilkerson agreed to cooperate. Radney testified that he spoke not only with Johnny, but directly with Wilkerson regarding the State’s offer not to seek the death penalty in exchange for Wilkerson’s cooperation. Although Radney said that he could not remember specific dates or the specific timing of events, he testified that he remembered that he had spoken with Wilkerson at the jail the day of the juvenile-detention hearing
 
 before
 
 he had approached the prosecutor; that he and Wilkerson had “discussed everything about” the case (record on direct appeal, R. 135); and that he had told Wilkerson that he would attempt to get the best plea agreement he could from the prosecutor. Radney also testified that, as best he could remember, he went straight from speaking with Wilkerson to the prosecutor’s office to discuss a plea. Radney said that, at that time, the prosecutor agreed not to seek the death penalty if Wilkerson cooperated with the police and that he then spoke with Wilkerson again and told him about the prosecutor’s offer and advised him to cooperate and give a statement. Radney also specifically testified that when he spoke with Wilkerson about cooperating, he spoke to both Wilkerson and Johnny, and that Wilkerson and Johnny both agreed that Wilkerson could be interviewed without Johnny’s presence as long as Jackson was present and Wilkerson had access to a cellular telephone. Radney also said that he specifically explained to both Wilkerson and Johnny that Jackson would be present during the interview, not him (Radney).
 

 Jackson testified that in September 2002, he was in law school and was employed by Radne^s law firm as an investigator. Jackson testified that Radney sent him to the juvenile-detention facility where Wilkerson was being held to speak with Wilkerson and then to report back to Rad-ney. Jackson said that he first met with Johnny before going to the detention center to meet with Wilkerson but that he did not remember Johnny asking if he could be present when Jackson spoke with Wilkerson. Jackson also said that he did not recall telling Johnny that he could not be present when Jackson spoke with Wilkerson, but that he could have told him that. Jackson testified that when he first met Wilkerson at the detention center, he told Wilkerson that Johnny had retained the law firm of Radney, Radney, and Brown to represent him, and that he was “an investigator with that firm.” (Record on direct appeal, R. 191.) Jackson did not specifically say to Wilkerson “I am not a lawyer.” (Record on direct appeal, R. 192.) Jackson also testified that he was with Radney on September 13, 2002, at the juvenile-detention hearing and that Radney “had conversations” with Wilkerson and his father, Johnny, and that Radney advised Wilkerson to cooperate in the investigation. (Record on direct appeal, R. 188.) Jackson testified that he was also present during Wilkerson’s confession on September 13, 2002, at the Opelika police department, but that he was not then functioning, nor did he ever function as Wilkerson’s legal counsel. Jackson said that he recorded the confession but that either “the tape ran out or there was a malfunction” and he did not have a recording of the confession. (Record on direct appeal, R. 188.) Jackson denied ever giving Wilkerson any legal advice, and repeated during his testimony that the person who advised Wilkerson to cooperate was Radney.
 

 Jennifer Tompkins, a corporal with the investigations division of the Opelika police department, testified that she participated in the interview of Wilkerson on September 13, 2002, during which she, Det. Hodge, another officer from the Opelika police department, and Jackson were pres
 
 *458
 
 ent. Cpl. Tompkins testified that before the interview began, Wilkerson spoke with his father by cellular telephone. Det. Hodge then advised Wilkerson of his juvenile
 
 Miranda
 
 rights, Wilkerson indicated he understood his rights, and Wilkerson signed a waiver-of-rights form. According to Cpl. Tompkins, when Det. Hodge informed Wilkerson of his right to have an attorney, he then paused and said “[0]bvi-ously, you have a representative here.” (Record on direct appeal, R. 161.) According to Cpl. Tompkins, Wilkerson was not promised anything for making a statement nor was he threatened or coerced. Cpl. Tompkins said that, at the time of the statement, Wilkerson had retained Radney to represent him and that Jackson was present only in the capacity of an investigator for Radney. Cpl. Tompkins said that Wilkerson then gave an oral statement confessing to his participation in the murder of Donald Williams in Opelika and the attempted murder of Peter Swyers in Auburn, and she later reduced that statement to writing. Cpl. Tompkins testified that the interview was lengthy, over eight hours, but that breaks were taken throughout the interview and a meal was provided to Wilkerson, and that approximately two hours of the eight-hour time frame was spent reducing the statement to writing. According to Cpl. Tompkins, she read the written statement to Wilkerson and he agreed that it was true and correct and signed each page of the 11-page statement.
 

 Cpl. Tompkins testified when questioned about the murder weapon, Wilkerson had said in his statement that because the police had not found the weapon during their search of his mother’s residence on September 11, 2002, his mother “must have found it and took it.” (Record on direct appeal, R. 181.) Cpl. Tompkins also testified that she was informed that while the interview was being conducted, the murder weapon was recovered from Juanita’s home. She said that she believed that Juanita had hidden the gun in the attic before the first police search on September 11, 2002, but that Johnny, who had been very cooperative with the police, had persuaded her to turn the gun over to the police.
 

 Cpl. Tompkins also testified that she was present at the juvenile-detention hearing held on September 13, 2002. She said that Wilkerson and his parents were also present during the hearing and that during the hearing Radney specifically referred to Jackson as his assistant and stated that Jackson was in his last year of law school and had not taken the bar exam yet. Specifically, Cpl. Tompkins testified that the following occurred during the juvenile-detention hearing:
 

 “[Radney] was talking with [the juvenile-court judge] and he' said that his client was willing to cooperate; was going to give a statement in regards to the murder investigation that was going on with Opelika, so that he was going to have his assistant Jason Jackson who was also present there sit in on the interview; said he was practically a lawyer; was in his last year of law school; he just hadn’t passed the bar yet.”
 

 (Record on direct appeal, R. 224.) Cpl. Tompkins said that Wilkerson was standing right next to Radney when Radney made the comments about Jackson and that the courtroom was small enough that she, sitting on the other side of the courtroom, could still hear the comments. Cpl. Tompkins further testified that, although the juvenile court judge did not specifically question Wilkerson about waiving his right to have an attorney present during his interview, the judge did ask if “this [arrangement with Jackson being present] is okay with everybody” and “everybody nod
 
 *459
 
 ded their head[s] yes.” (Record on direct appeal, R. 226.)
 

 As noted above, Wilkerson also testified at the suppression hearing on his own behalf. In addition to denying on direct examination ever receiving legal advice from Radney to cooperate with the police, Wilkerson testified on cross-examination, in direct contrast to both Radney’s and Jackson’s testimony, that he had received the advice to cooperate from Jackson, not Radney. Wilkerson also testified that he had met Radney at the juvenile-detention hearing, but he denied that he had ever had any conversations with Radney. Wilkerson also denied ever speaking to Radney at the jail the day of the juvenile-detention hearing, stating that only Jackson came to the jail that day to speak with him.
 

 At the Rule 32 hearing, Wilkerson called his mother, Juanita, his stepmother, Pamela Wilkerson (hereinafter “Pamela”), and his father, Johnny, to testify, all of whom he claimed in his petition should have been called to testify at the suppression hearing. Wilkerson also testified on his own behalf. Juanita testified at the hearing that she had had no dealings with Jackson prior to Wilkerson’s statement, and that it was her ex-husband, Johnny, who had all the dealings with Radney and Radney’s law firm regarding Wilkerson’s representation. Juanita testified that Johnny told her that Jackson was an attorney with Radney’s law firm. Juanita admitted to finding the murder weapon under Wilkerson’s bed and hiding it before the first search of her home was conducted on September 11, 2002. Juanita testified that she later— while Wilkerson was giving his confession on September 13, 2002 — turned the weapon over to police after receiving a telephone call from Johnny telling her that Wilkerson was cooperating and that she should give the weapon to the police. Juanita testified that Johnny told her that it was Jackson who recommended that she turn in the weapon. Pamela testified that she was with Johnny when he met Jackson the day Johnny hired Radney to represent Wilkerson but that she sat in the car and did not hear the conversation between the two of them. Pamela testified, however, that she believed Jackson was an attorney because when Johnny hired Radney to represent Wilkerson, Johnny told her that Radney had told him that Radney would “send[ ] someone from his law firm” to meet with them and Jackson was the person that came to the meeting. (R. 79.)
 

 Johnny testified at the Rule 32 hearing that he thought Jackson was an attorney because when he had hired Radney, Rad-ney had told him that he would “send someone over from his office” to meet with Johnny and Jackson came to the meeting. (R. 16.) Johnny admitted, however, that when he first met with Jackson, Jackson indicated that he was “with” Radney’s law firm, but did not state that he was an attorney. (R. 16.) Johnny also testified that he told Wilkerson just before Wilkerson first met with Jackson — as noted above, this meeting occurred on September 12, 2002, the day before Wilkerson’s confession — that Jackson was “was one of the attorneys” Johnny had hired. (R. 17.) Johnny testified that Radney never spoke with him about Wilkerson’s cooperating with the police; that Jackson never told him the consequences of Wilkerson’s cooperating with the police; and that neither Radney nor Jackson ever told him why “they” wanted Wilkerson to cooperate with the police. (R. 21.) Johnny testified that when Jackson informed him that Wilkerson was going to be interviewed a second time, he asked Jackson if he could be present, and Jackson told him that he could not be present during the interview. Johnny also said that he requested that Wilkerson have access to a telephone during the interview, and that request was
 
 *460
 
 granted. Johnny further testified that sometime either before or during Wilkerson’s confession on September 13, 2002, Wilkerson telephoned him and again questioned him about Jackson, and that he again told Wilkerson that Jackson was “one of [Wilkerson’s] attorneys.” (R. 22.) He also stated that, at some point, after speaking with Jackson about the murder weapon, he advised Juanita to turn over the weapon to police. Johnny said that throughout Radney’s representation of Wilkerson, he was under the impression that Jackson was an attorney and that he did not find out that Jackson was not an attorney until he hired Davis to represent Wilkerson. However, on cross-examination, Johnny admitted that he, his wife Pamela, and his ex-wife Juanita were all present with Wilkerson at the juvenile-detention hearing.
 
 [8]
 

 Wilkerson also testified at the Rule 32 hearing that, based on his father’s statements, he believed Jackson was an attorney and that he confessed to the murder only because Jackson told him to. He also testified that, like Johnny, he did not find out that Jackson was not an attorney until Davis was hired to represent him.
 

 “It has long been the law that a confession is
 
 prima facie
 
 involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a
 
 Miranda
 
 predicate.”
 
 Waldrop v. State,
 
 859 So.2d 1138, 1155 (Ala.Crim.App. 2000), aff'd, 859 So.2d 1181 (Ala.2002). To establish a proper
 
 Miranda
 
 predicate, the State must prove that “the accused was informed of his
 
 Miranda
 
 rights before he made the statement” and that “the accused voluntarily and knowingly waived his
 
 Miranda
 
 rights before making his statement.”
 
 Jones v. State,
 
 987 So.2d 1156, 1164 (Ala.Crim.App.2006). “Whether a waiver of
 
 Miranda
 
 rights is voluntarily, knowingly, and intelligently made depends on the facts of each case, considering the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials in conducting the interrogation.”
 
 Foldi v. State,
 
 861 So.2d 414, 421 (Ala.Crim.App.2002). “To prove [the] voluntariness [of the confession], the State must establish that the defendant ‘made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.’ ”
 
 Eggers v. State,
 
 914 So.2d 883, 898-99 (Ala.Crim. App.2004) (quoting
 
 Lewis v. State,
 
 535 So.2d 228, 235 (Ala.Crim.App.1988)). As with the
 
 Miranda
 
 predicate, “when determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession.”
 
 Maxwell v. State,
 
 828 So.2d 347, 354 (Ala.Crim.App.2000). The State must prove the
 
 Miranda
 
 predicate and volun-tariness of the confession only by a preponderance of the evidence. See, e.g.,
 
 McLeod v. State,
 
 718 So.2d 727 (Ala.1998) (State must prove voluntariness of confession by a preponderance of the evidence), and
 
 Smith v. State,
 
 795 So.2d 788, 808 (Ala.Crim.App.2000) (State must prove
 
 Miranda
 
 predicate by a preponderance of the evidence).
 

 Moreover, the United States Supreme Court has held that “[t]he sole concern of the Fifth Amendment, on which
 
 *461
 

 Miranda
 
 is based, is governmental coercion” and that “[t]he voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on ‘free choice’ in any broader sense of the word.”
 
 Colorado v.
 
 Connelly, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Likewise, the Supreme Court has held that “some sort of ‘state action’” is required “to support a claim of [the] violation of the Due Process Clause of the Fourteenth Amendment.” 479 U.S. at 165. In other words, “coercive police activity is a necessary predicate to the finding that a confession is not ‘voluntary1 within the meaning of the Due Process Clause of the Fourteenth Amendment.” 479 U.S. at 167. See also
 
 Quinlivan v. State,
 
 627 So.2d 1082, 1086 (Ala.Crim.App.1992) (“A statement is constitutionally involuntary only if it is the product of coercion by government agents.”).
 

 In this case, the evidence presented by the State at the suppression hearing was more than sufficient to prove by a preponderance of the evidence that Wilkerson was properly advised of, and that he knowingly and voluntarily waived, his juvenile
 
 Miranda
 
 rights and that Wilkerson’s confession was the product of his own free will, i.e., that it was voluntary. The evidence established that Wilkerson was advised of his juvenile
 
 Miranda
 
 rights before his confession and that he signed a waiver-of-rights form. The evidence also established that Wilkerson had completed the 11th grade, that he could read, write, and understand English, and that he indicated to the officers interviewing him that he understood his rights. In addition, Wilkerson had, when interviewed previously, invoked his juvenile
 
 Miranda
 
 right to have his parent present during questioning, thus showing Wilkerson’s understanding of his rights. Moreover, the evidence established that law-enforcement officers did not coerce or threaten Wilkerson to make a statement. Rather, the evidence clearly established that Wilkerson’s confession was based on the advice of his counsel and was a strategic move to avoid the death penalty.
 

 Any additional evidence presented by trial counsel would not have changed the fact that the State met its burden of proof to warrant admission of Wilkerson’s confession. The evidence and argument presented by Wilkerson during the Rule 32 proceedings in no way undermines the State’s evidence presented at the suppression hearing nor indicates that the waiver of Wilkerson’s juvenile
 
 Miranda
 
 rights or Wilkerson’s confession was involuntary. The evidence presented during the Rule 32 proceedings indicates only that any mistaken belief on Wilkerson’s part regarding Jackson’s status was imparted to him solely by his father, and not by any government agent. Indeed, at Davis’s deposition, Wilkerson, through Rule 32 counsel, stipulated “for the Record that the prosecutor’s office did nothing wrong ... nor did the police — law enforcement, they were all doing their jobs.” (C.Supp.379.) Although Wilkerson argued in his petition that the police “solidified]” his belief that Jackson was an attorney by stating to him, while advising him of his juvenile
 
 Miranda
 
 rights, that he had a “representative” present (C. 69), Wilkerson does not argue, and we do not find, that this statement amounted to coercion. Absent coercive
 
 governmental
 
 activity, any mistaken belief on Wilkerson’s part would not have rendered his juvenile
 
 Miranda
 
 waiver and subsequent confession involuntary. See, e.g.,
 
 United States v. LeBrun,
 
 363 F.3d 715 (8th Cir.2004), and
 
 Roach v. Commonwealth,
 
 251 Va. 324, 468 S.E.2d 98 (1996), overruled on other grounds,
 
 Morrisette v. Warden of Sussex I State Prison,
 
 270 Va. 188, 613 S.E.2d 551 (2005) (both holding
 
 *462
 
 that a mistaken belief of promised leniency-does not necessarily render a
 
 Miranda
 
 waiver or subsequent confession involuntary);
 
 Potts v. Commonwealth,
 
 35 Va.App. 485, 546 S.E.2d 229 (2001) (holding that a mistaken belief that he could go home if he confessed did not render defendant’s
 
 Miranda
 
 waiver and subsequent confession involuntary);
 
 State v. Norfolk,
 
 221 Neb. 810, 381 N.W.2d 120 (1986) (holding that a mistaken belief that an oral statement, as opposed to a written one, would not be admissible as evidence to convict a defendant does not render a
 
 Miranda
 
 waiver or subsequent confession involuntary); and
 
 State v. Roach,
 
 146 N.J. 208, 680 A.2d 634 (1996) (holding that a mistaken belief that he was being interviewed as a witness, not a suspect, did not render
 
 Miranda
 
 waiver and subsequent inculpatory statement involuntary).
 

 Moreover, we agree with the circuit court that the testimony of Juanita, Pamela, and Johnny was not relevant to the suppression issue. Although both Juanita and Pamela testified at the Rule 32 hearing that they believed that Jackson was an attorney with Radney’s law firm, neither testified that they ever spoke with Wilkerson before his confession on September 13, 2002, or told Wilkerson that Jackson was an attorney. “Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.”
 
 Moran v. Burbine,
 
 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Likewise, although, unlike Juanita and Pamela, Johnny testified that he told Wilkerson that Jackson was one of Wilkerson’s attorneys, this testimony established only that Wilkerson was told by Johnny that Jackson was an attorney, not that Wilkerson actually
 
 believed
 
 that Jackson was an attorney, especially in light of Jackson’s testimony at the suppression hearing that he specifically introduced himself to Wilkerson as an “investigator” and Cpl. Tompkins’s testimony at the suppression hearing that Wilkerson was standing right next to Radney during the juvenile-detention hearing when Radney specifically stated that Jackson was in law school and that he had not yet passed the bar exam. Contrary to Wilkerson’s contention, merely because he was a juvenile does not automatically make his family’s beliefs relevant to determining whether he voluntarily waived his juvenile
 
 Miranda,
 
 rights and confessed.
 

 Finally, the testimony presented during the Rule 32 proceedings, even if presented at the suppression hearing, would have done nothing more than create a conflict in the evidence for the trial court to resolve. As noted above, ample testimony was presented at the suppression hearing indicating that Wilkerson was specifically told by Jackson that Jackson was an investigator and that Wilkerson was present when Radney specifically indicated that Jackson was not an attorney. The record reflects that the judge who ruled on Wilkerson’s Rule 32 petition was the same judge who presided over Wilkerson’s trial and who denied Wilkerson’s motion to suppress. Although the circuit court did not specifically address in its findings on this claim the testimony presented during the Rule 32 proceedings by Wilkerson, Johnny, Juanita, and Pamela, by denying Wilkerson relief on this claim, the circuit court obviously chose, albeit implicitly, not to believe that testimony, and to resolve the conflict in the evidence adversely to Wilkerson. We will not disturb that finding on appeal.
 

 For these reasons, we find no abuse of discretion on the part of the circuit court in denying this claim.
 

 II.
 

 In Claim II in his petition, Wilkerson alleged: (a) That pretrial-counsel Radney
 
 *463
 
 was ineffective for not fully investigating the facts and law regarding Wilkerson’s case and for not explaining “with complete candor” (C. 107) the circumstances of the case, “including the probable outcome” (C. 108), to Wilkerson and his family so that they could make a “knowing and voluntary waiver of [Wilkerson’s] right to counsel and right to remain silent” (C. 107); and (b) that trial counsel Davis and Gillenwa-ters were ineffective for not challenging Radney’s assistance in this regard at trial. (Issue IV in Wilkerson’s brief.)
 

 A.
 

 With respect to his challenge to Radney’s performance, Wilkerson alleged, as best we can discern,
 
 [9]
 
 that Radney failed to investigate the facts of the case, that he failed to apprise himself of the law regarding accomplice liability, and that he failed to fully advise Wilkerson and his family of the charges and possible sentence Wilkerson was facing before advising Wilkerson to cooperate. Wilkerson also appeared to allege that Radney misinformed him and his family that he would receive two 10-year sentences (one for the murder and one for the attempted murder) and that he would be released in approximately three years.
 
 [10]
 

 In its order, the circuit court first found this claim to be barred by Rule 32.2(a)(3) and (a)(5) because it could have been, but was not, raised and addressed at trial and on appeal. Wilkerson argues that this finding was erroneous; however, for the reasons explained in Part I.A. of this opinion, the circuit court correctly found this claim to be barred by Rule 32.2(a)(3) and (a)(5). In the alternative, the circuit court found this claim to be meritless, stating:
 

 “Mr. Davis testified that his understanding of the situation was that the petitioner and his family were simply confused as to the state of negotiations between Mr. Radney and the State. As to Mr. Radney’s efforts to inform himself as to the facts of the case, it is clear from all the evidence that Mr. Radney sent an investigator to speak with the petitioner for just that purpose. Hon. Jason Jackson (now an attorney, but serving as an investigator at the time of the relevant events) kept in contact with Mr. Radney and passed information between the petitioner and Mr. Radney.
 

 “Mr. Radney was fully aware of the law relevant to the petitioner’s case at the time he represented the petitioner. Mr. Radney was an experienced attorney, had handled capital cases and felony jury trials before, and was aware of not only the sentencing requirements but also the real-world application of those sentences in the prison system. It is clear from the totality of the evidence that Mr. Radney was well aware of the law related to the petitioner’s case.”
 

 (C. 502; footnote omitted.) We agree with the circuit court’s findings.
 

 Radney testified at his deposition, and at the suppression hearing, that, at the time
 
 *464
 
 he advised Wilkerson to cooperate, he was fully aware of the facts of the case from Jackson’s meeting with Wilkerson as well as from speaking with Wilkerson himself, and that he was fully aware of the evidence the State had against Wilkerson. His testimony also established that he was aware of the doctrine of accomplice liability and of Wilkerson’s liability as an accomplice. See, e.g.,
 
 Price v. State,
 
 725 So.2d 1003, 1055 (Ala.Crim.App.1997) (“[A]n individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the principle wrongdoer” and “[a]s long as the [defendant] intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or his guilt.”), aff'd, 725 So.2d 1063 (Ala.1998). In addition, Radney made clear in his testimony that he fully advised Wilkerson and Johnny regarding Wilkerson’s rights relating to the murder case, specifically testifying that he and Wilkerson “discussed everything about” the case. (Record on direct appeal, R. 135.) Radney also testified that he specifically told Johnny that Wilkerson was facing the death penalty. Although Wilkerson denied ever discussing the case with Radney and Johnny testified that he was not aware of what charges Wilkerson was facing, resolution of this conflicting evidence was for the circuit court. The court obviously resolved the conflicting evidence adversely to Wilkerson, and we will not disturb that finding on appeal.
 

 In addition, Radney denied ever telling Wilkerson or his family that he would receive two 10-year sentences and that he would be released in approximately 3 years. Rather, Radney testified that the plea negotiations with the prosecutor included two life sentences and that the negotiations broke down because he wanted the sentences to run concurrently so that Wilkerson could be eligible for parole in 10 years and the prosecutor wanted the sentences to run consecutively so that Wilkerson would not be eligible for parole for 20 years. At the pretrial hearing on the motion to suppress, Jackson also testified that he had never heard any discussion between Radney and Johnny or Wilkerson about Wilkerson’s receiving two 10-year sentences. Moreover, as the circuit court noted in its order, at his deposition, Davis testified that he believed Wilkerson and his family were simply confused regarding the state of negotiations with the prosecutor and heard what they wanted to hear— 10 years — instead of what was actually being discussed — two life sentences. Although Johnny testified at the Rule 32 hearing that Radney specifically told him that Wilkerson would receive two 10-year sentences and that he would be eligible for release after only 3 years, this testimony created nothing more than a conflict in the evidence to be resolved by the circuit court. The circuit court obviously resolved that conflicting evidence adversely to Wilkerson and we will not disturb that finding on appeal.
 

 Therefore, we find no abuse of discretion on the part of the circuit court in denying this claim.
 

 B.
 

 With respect to Wilkerson’s claim regarding Davis’s and Gillenwaters’s not challenging Radney’s effectiveness, the circuit court correctly found this claim to be meritless because, as explained in Part II.A. of this opinion, Radney was not ineffective in this regard. Therefore, Davis and Gillenwaters could not be ineffective for not challenging Radney’s effectiveness. See, e.g.,
 
 Birdsong v. State,
 
 929 So.2d 1027, 1030 (Ala.Crim.App.2005) (“Because trial counsel was not ineffective ... appellate counsel could not be ineffective for not
 
 *465
 
 raising this allegation of ineffective assistance of trial counsel.”).
 

 III.
 

 In Claim III in his petition, Wilkerson alleged: (a) That pretrial counsel Radney was ineffective for “making a contingent deal subject to the approval of the prosecutor and the victims” (C. 112); and (b) that trial counsel Davis and Gillenwaters were ineffective for not challenging Rad-ney’s assistance in this regard at trial. (Issue VI in Wilkerson’s brief.)
 

 A.
 

 With respect to his challenge to Rad-ney’s assistance, Wilkerson argued in his petition that the policy of both the prosecutor and the trial judge in the case was not to make or accept any plea agreements without the express consent of the victims and/or the victims’ families and that Rad-ney was ineffective for agreeing with the prosecutor to have Wilkerson cooperate knowing that Wilkerson’s sentence would have to be approved by the victims and/or their families. The circuit court found this claim to be meritless, stating:
 

 “The third count of the petition is an ineffective assistance of counsel claim regarding Mr. Radney’s negotiation tactics with the District Attorney. The petitioner’s reliance on
 
 Jones v. State,
 
 727 So.2d 866 (Ala.Crim.App.1998), is flawed in that the defendant in
 
 Jones
 
 made a final deal contingent upon later events. There are no such facts in this case. It is clear that Mr. Radney and the State were in the midst of negotiations, and that to facilitate those negotiations Mr. Radney advised his client to cooperate with the authorities. Mr. Radney, possibly through Mr. Jackson, informed the petitioner as to the state of the negotiations and as to Mr. Radney’s goals for the eventual outcome of the negotiations. There was no contingent deal in this case, merely an ongoing set of negotiations.”
 

 (C. 508; footnote omitted.) We agree with the circuit court’s finding that there was no contingent agreement in this case, although we disagree with the implicit finding by the court that there was no agreement at all at the time Radney advised Wilkerson to cooperate.
 

 As noted above, the evidence at the suppression hearing and at the Rule 32 proceedings established that there was, in fact, an agreement between Radney and the prosecutor at the time Wilkerson confessed. Specifically, the evidence established that the prosecutor agreed not to seek the death penalty against Wilkerson if he cooperated with the investigation of the murder. There was no evidence indicating that this agreement was contingent on any approval by victims and/or the victims’ families. Rather, as the circuit court correctly found, it was after this agreement was reached and Wilkerson confessed that Radney and the prosecutor continued negotiating regarding the sentence Wilkerson would receive, and it was those negotiations, none of which led to an actual agreement, that were contingent on the approval of the victims and/or the victims’ families. Thus, because no contingent agreement existed, this claim is meritless and was properly denied by the circuit court.
 

 B.
 

 As for Wilkerson’s claim that Davis and Gillenwaters were ineffective for not challenging Radney’s effectiveness, because Radney was not ineffective in this regard, Davis and Gillenwaters could not be ineffective for not raising that claim. See, e.g.,
 
 Birdsong,
 
 supra. Therefore, denial of this claim was also proper.
 

 
 *466
 
 IV.
 

 In Claim IV in his petition, Wilkerson alleged that trial counsel Davis and Gillen-waters were ineffective for not objecting to the admission of Wilkerson’s confession on the ground that the State had not proven the corpus delicti of the offense. However, Wilkerson does not pursue this claim in his brief on appeal. See, e.g.,
 
 Brownlee v. State,
 
 666 So.2d 91, 93 (Ala.Crim.App.1995) (“We will not review issues not listed and argued in brief.”). Indeed, Wilkerson expressly abandons this claim, stating in his brief: “The trial court was correct on the
 
 corpus delicti
 
 issue, and it is being dropped.” (Wilkerson’s brief, at p. 1 n. 2.) Therefore, we do not consider this claim.
 

 V.
 

 In Claim V in his petition, Wilkerson alleged that trial counsel Davis and Gillen-waters were ineffective with respect to the trial court’s jury instructions. (Issue VII in Wilkerson’s brief.) Specifically, he argued: (a) That trial counsel were ineffective for not objecting to the trial court’s jury instructions on complicity which, he said, erroneously informed the jury that Wilkerson only had to be complicit in the robbery and did not have to be complicit in the murder, to be convicted of capital murder; (b) that trial counsel were ineffective for not objecting to the trial court’s jury instruction on reasonable doubt because, he claimed, the trial court erroneously told the jury that it had to have a “substantial doubt” to acquit Wilkerson; and (c) that trial counsel were ineffective for not requesting that the trial court instruct the jury that mere presence at the scene of the crime does not make someone an accomplice.
 

 In its order, the circuit court appeared to find these claims to be barred by Rule 32.2(a)(5) because the merits of the underlying issues “could have been raised on appeal but were not.” (C. 503.) Wilkerson argues that this finding was incorrect. Although we agree with the circuit court that the underlying issues relating to the propriety of the trial court’s jury instructions could have been raised on appeal, that does not warrant denial of a claim of ineffective assistance counsel. In this case, trial counsel’s alleged ineffectiveness could not have been raised on appeal because the trial transcript was not complete in time for appellate counsel to have reviewed it and filed a motion for a new trial challenging trial counsel’s effectiveness. See, e.g.,
 
 V.R. v. State,
 
 852 So.2d 194, 202 (Ala.Crim.App.2002) (“[A] defendant is not precluded by Rule 32.2(a)(3) and (5) from raising an ineffective-assistance-of-trial-counsel claim for the first time in a Rule 32 petition if the trial transcript was not prepared in time for appellate counsel to have reviewed the transcript to ascertain whether such a claim was viable and to present the claim in a timely filed motion for a new trial.”). Therefore, the circuit court erred in finding these claims to be barred. However, the circuit court also made alternative findings on the merits, specifically finding that the jury instructions on accomplice liability and reasonable doubt were proper and that there was no evidence presented at trial to support trial counsel requesting a jury instruction on mere presence. We agree with these alternative findings.
 

 A.
 

 The record from Wilkerson’s direct appeal reflects the following instructions by the trial court with respect to complicity and capital murder:
 

 “[T]he first thing I want to read to you is from Section 13A-2-23[, Ala.Code 1975], It’s talking about complicity.
 

 “A person is legally accountable for the behavior of another person consti
 
 *467
 
 tuting a crime, if with intent to promote or assist the commission of the crime he either, one, procures, induces, or causes such other person to commit the crime; or aides and abets such person in committing the crime; or has a legal duty to prevent the commission of the crime and fails to make such effort as he is legally required to make to prevent it.
 

 “Now,
 
 Black’s Law Dictionary
 
 defines an abetter as:
 

 “ ‘A person who aids, encourages or assists in the commission of a crime.’
 

 “To aid is to assist or help.
 

 “Aiding and abetting is defined as:
 

 “ ‘To assist or facilitate the commission of a crime or to — to promote its accomplishment.’
 

 “Now, at this time, Ladies and gentlemen, I am going to define for you Capital Murder.
 

 “The Defendant is charged with Capital Murder. The law states that an Intentional Murder committed during a Robbery in the First Degree is Capital Murder.
 

 “A person commits an Intentional Murder if he causes the death of another person and in performing the acts or acts which caused the death of that person he intends to kill that person or another present — or another person.
 

 “A person commits Robbery in the First Degree if, in the course of committing or attempting to commit a theft, he uses force against the person of the owner or another person present with the intent to overcome his physical resistance or physical power of resistance or threatens the imminent use of force against the person of the owner with the intent to compel acquiescence to the taking of or escaping with the property, and in doing so, he causes serious physical injury to another.
 

 “To convict, the State must prove without — without a reasonable doubt each of the following elements— should prove beyond a reasonable doubt each of the following elements of intentional Murder during Robbery in the First Degree.
 

 “First—
 

 “ — and there are going to be various elements and each one must be proven beyond a reasonable doubt.
 

 “First: That Donald Edward Williams is dead.
 

 “That’s the first element.
 

 “Two: That the Defendant, Bruce Antonio Wilkerson, caused the death of Donald Edward Williams by shooting him with a rifle or
 
 aided and abetted another in the shooting,
 
 to-wit, Lamar Robinson or Laregis Ferrell.
 

 “Three: That in committing the act or acts that caused the death of Donald Edward Williams,
 
 the Defendant intended to kill the decedent or another person.
 

 “A person acts intentionally when it is his purpose to cause the death of another person.
 

 “The intent to kill must be real and specific.
 

 “Four: That the Defendant committed or attempted to commit the theft of lawful paper currency.
 

 “Five: That in the course of committing or attempting to commit a theft or in the immediate flight after the attempt or commission, Bruce Antonio Wilkerson either used force or threatened the imminent use of force against the person of Donald Edward Williams or another person present
 
 *468
 
 with the intent to overcome his physical resistance or physical power to resist or to compel acquiescence to the taking of or escaping with the property-
 

 “And six: The Murder took place during the Robbery.”
 

 (Record on direct appeal, R. 1656-62; emphasis added.) The trial court later repeated the instruction for capital murder, upon questioning by the jury, again stating that the State was required to prove that Wilkerson caused Williams’s death by either shooting Williams or aiding and abetting another in shooting Williams.
 

 “ ‘[N]o defendant is guilty of a capital offense unless he had an intent to kill.’ ”
 
 Lewis v. State,
 
 456 So.2d 413, 416 (Ala.Crim.App.1984) (quoting E. Carnes,
 
 Alabama’s 1981 Capital Punishment Statute,
 
 42 Ala.Law. 456, 468 (1981)). “However, a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself.”
 
 Id.
 
 at 417. Thus, “the accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.”
 
 Ex parte Raines,
 
 429 So.2d 1111, 1112 (Ala.1982). To that end, “the jury must be properly charged on the intent to kill issue.”
 
 Id.
 
 at 1113. See also
 
 Ziegler v. State,
 
 886 So.2d 127, 140 (Ala.Crim.App. 2003) (“[T]o be convicted of [a] capital offense and sentenced to death, a defendant must have had a particularized intent to kill and the jury must have been charged on the requirement of specific intent to kill.”).
 

 In this case, the trial court’s instructions on accomplice liability and capital murder, taken as a whole, clearly informed the jury, contrary to Wilkerson’s contention, that to be convicted of capital murder, Wilkerson had to have been an accomplice in the killing, i.e., that he had to have aided and abetted in the shooting and had the intent to kill, as opposed to merely being an accomplice in the underlying robbery. Because the instructions were proper, any objection by trial counsel would have been baseless. “[C]ounsel could not be ineffective for failing to raise a baseless objection.”
 
 Bearden v. State,
 
 825 So.2d 868, 872 (Ala.Crim.App.2001). Therefore, denial of this claim was proper.
 

 B.
 

 The record from Wilkerson’s direct appeal reflects that the trial court instructed the jury on reasonable doubt as follows:
 

 “Now, reasonable doubt. That’s a term that you probably heard a good bit before you even appeared for jury duty, but it’s defined as follows:
 

 “In order to find the Defendant guilty, the prosecution or the State must prove guilt beyond a reasonable doubt and a moral certainty.
 

 “Now, what do I mean by a reasonable doubt?
 

 “A reasonable doubt is not a fanciful doubt or a conjectural doubt, but is a doubt which appeals to your reason after considering all the evidence in the case.
 

 “The Court can better express it this way: In connection with reasonable doubt, you cannot establish guilt to a mathematical certainty. You can only do it to that certainty as you weigh the every day affairs of life that you come in contact with. A reasonable doubt does not mean a capricious doubt. It is not a doubt based on conjecture, speculation, or guess work. It does not mean beyond all doubt. A reasonable doubt means a real doubt
 
 *469
 
 or a substantial doubt growing out of the evidence. It is a doubt for which a reason can be given.
 

 “Now, the term moral certainty:
 

 “The expression beyond a reasonable doubt and to a moral certainty are equivalent and, therefore, mean the same thing.”
 

 (Record on direct appeal, R. 1650-53.)
 

 Read as a whole and in context of the trial court’s entire oral charge, we find no error in the use of the term “substantial doubt” in this instruction. Similar jury instructions on reasonable doubt have repeatedly been upheld. See, e.g.,
 
 Victor v. Nebraska,
 
 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994);
 
 Lewis v. State,
 
 24 So.3d 480 (Ala.Crim.App.2006), aff'd, 24 So.3d 540 (Ala.2009);
 
 Turner v. State,
 
 924 So.2d 737 (Ala.Crim.App.2002); and
 
 Greenhill v. State,
 
 746 So.2d 1064 (Ala. Crim.App.1999). Indeed, Wilkerson concedes in his brief on appeal that the use of the term “substantial doubt” in jury instructions does not, by itself, rise to the level of error in
 
 Cage v. Louisiana,
 
 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and argues only that this issue should be considered in a cumulative-error analysis. (See Part VII of this opinion.) Because there was no error in this instruction, trial counsel were not ineffective for not objecting to it. As noted above, counsel cannot be ineffective for not raising a groundless objection. See
 
 Bearden,
 
 supra. Therefore, denial of this claim was proper.
 

 C.
 

 Finally, Wilkerson argued in his petition that his trial counsel were ineffective for not requesting a jury instruction to the effect that mere presence at the scene of the crime does not make a person an accomplice. However, the circuit court correctly found that Wilkerson was not entitled to such an instruction.
 

 “An accused has the right to have the jury charged on ‘ “any material hypothesis which the evidence in his favor tends to establish.” ’
 
 Ex parte Stork,
 
 475 So.2d 623, 624 (Ala.1985). ‘In determining whether an instruction was supported by the evidence the question is not whether the Supreme Court or Court of Criminal Appeals believes the evidence, but simply whether such evidence was presented.’
 
 Id.
 
 ‘[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.’
 
 Ex parte Chavers,
 
 361 So.2d 1106, 1107 (Ala.1978). ‘ “ ‘It is a basic tenet of Alabama law that “a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court’s failure to give those instructions is reversible error.” ””
 
 Ex parte McGriff,
 
 908 So.2d 1024, 1035 (Ala.2004), quoting
 
 Winner Int’l Corp. v. Common Sense, Inc.,
 
 863 So.2d 1088, 1091 (Ala.2003), quoting in turn other cases. ‘In order to determine whether the evidence is sufficient to necessitate an instruction and to allow the jury to consider the defense, we must view the testimony most favorably to the defendant.’
 
 Ex parte Pettway,
 
 594 So.2d 1196, 1200 (Ala.1991).”
 

 Williams v. State,
 
 938 So.2d 440, 444-45 (Ala.Crim.App.2005). “[W]hile mere presence of an individual at the time and place of a crime does not make him a party to the crime, any assistance rendered in furtherance of commission of the offense will suffice.”
 
 Travis v. State,
 
 776 So.2d 819, 863 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000). In this case, even viewed most favorably to Wilkerson, there was simply no reasonable theory from the evi
 
 *470
 
 dence to support the idea that Wilkerson was “merely present” at the scene of the crime and was not, in any way, connected to the crime. Because an instruction on “mere presence” was not warranted, trial counsel were not ineffective for not requesting such an instruction. Therefore, denial of this claim was proper.
 

 VI.
 

 In Claim VI in his petition, Wilkerson alleged: (a) That trial counsel Davis and Gillenwaters were ineffective for arguing what he claimed were “inconsistent theories” during closing arguments (C. 129) (Issue VIII in Wilkerson’s brief); and (b) that trial counsel Davis and Gillenwaters were ineffective for not objecting to what he claimed was prosecutorial misconduct regarding the sequestration of witnesses.
 

 A.
 

 With respect to Wilkerson’s challenge to Davis’s and Gillenwaters’s closing arguments, Wilkerson alleged in his petition that Davis argued to the jury that Wilkerson was not guilty while Gillenwa-ters argued to the jury that Wilkerson was guilty of the lesser-included offense of felony murder. Because he could not be both innocent and guilty at the same time, Wilkerson concluded, his counsel were ineffective in this regard.
 

 The circuit court found the claim to be barred by Rule 32.2(a)(4) because “[t]he merits of this claim were raised on appeal.” (C. 504.) Wilkerson argues that this finding was incorrect. We agree. Ineffective assistance of trial counsel was not raised on appeal, nor could it have been because, as noted previously, the trial transcript was not complete in time for appellate counsel to have reviewed it and filed a motion for a new trial challenging trial counsel’s effectiveness. See
 
 V.R.,
 
 supra. In the alternative, however, the circuit court found the claim to be meritless, stating: “[T]he petitioner’s defense counsel did not argue ‘mutually exclusive’ defenses. The jury could have found that the petitioner was not guilty of capital murder and yet guilty of a lesser included offense.” (C. 504.) We agree with the circuit court that Wilkerson’s counsel did not argue mutually exclusive, or even inconsistent, defenses during closing argument.
 

 The record from Wilkerson’s direct appeal reflects that Gillenwaters began the defense’s closing argument by arguing that Wilkerson had no intent to kill, and that, therefore, at most, he was guilty of the lesser-included offense of felony murder. Davis concluded the defense’s closing argument by arguing to the jury that Wilkerson’s confession was made in a coercive environment, that Wilkerson was not a willing participant in the crime, but was under the control of Lamar Robinson, and that, therefore, Wilkerson was not guilty of capital murder. As the circuit court pointed out, the jury could have found that Wilkerson was not guilty of capital murder but that he was still guilty of a lesser-included offense. We do not find trial counsel’s closing arguments to be inconsistent. Therefore, denial of this claim was proper.
 

 B.
 

 With respect to Wilkerson’s challenge to Davis’s and Gillenwaters’s not objecting to alleged prosecutorial misconduct, Wilkerson does not pursue this claim in his brief on appeal. Therefore, it is deemed abandoned and will not be considered. See, e.g.,
 
 Brownlee v. State,
 
 666 So.2d 91, 93 (Ala.Crim.App.1995) (“We will not review issues not listed and argued in brief.”).
 

 VII.
 

 In Claim VII in his petition, Wilkerson alleged that the cumulative effect of
 
 *471
 
 pretrial counsel’s and trial counsel’s errors requires that he be granted relief. (Issue IX in Wilkerson’s brief.) In its order, the circuit court found this claim to meritless, stating:
 

 “The petitioner’s seventh claim is that an accumulation of minor errors would constitute error worthy of setting aside the petitioner’s conviction. However, the Court finds that if any error was committed in the petitioner’s trial, or if trial counsel was in any way ineffective, there is not enough error or ineffectiveness present to have prejudiced the petitioner’s case.”
 

 (C. 504.) We agree.
 

 First, as explained in Parts I through VI of this opinion, neither Radney nor Davis and Gillenwaters were ineffective; therefore, there could be no cumulative error. Second, even if Radney, Davis, or Gillen-waters were deficient in any way, there was no prejudice to Wilkerson. Therefore, the circuit court properly denied this claim.
 

 Based on the foregoing, the judgment of the circuit court denying Wilkerson’s Rule 32 petition is affirmed.
 

 AFFIRMED.
 

 WINDOM, KELLUM, BURKE, and JOINER, JJ., concur.
 

 [1]
 

 . The circuit court did not address in its order the claim raised in Wilkerson’s August 20, 2008, amendment. However, Wilkerson also does not pursue that claim on appeal. Therefore, that claim is deemed abandoned and will not be considered by this Court. See, e.g.,
 
 Brownlee
 
 v.
 
 State,
 
 666 So.2d 91, 93 (Ala.Crim.App.1995) (“We will not review issues not listed and argued in brief.”).
 

 [2]
 

 . This court may take judicial notice of its own records. See
 
 Hull v. State,
 
 607 So.2d 369 (Ala.Crim.App.1992).
 

 [3]
 

 . See
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and fer-mer Rule 11, Ala. R. Juv. P., in effect at the time of Wilkerson’s statement, but rescinded effective January 1, 2009, in light of § 12-15-202, Ala.Code 1975.
 

 [4]
 

 . As explained more fully below, the record indicates that Wilkerson’s mother initially hid the murder weapon from police, but later turned it in to the police based on Wilkerson’s cooperation.
 

 [5]
 

 . Although Wilkerson was 17 years old at the time of the murder in 2002, it was not until 2005 that the United States Supreme Court held in
 
 Roper
 
 v.
 
 Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), that it was unconstitutional to sentence to death a defendant who was under the age of 18 years at the time of the crime.
 

 [6]
 

 .
 
 Wilkerson argues on appeal that at the time Radney advised him to cooperate, the State had little to no evidence against him. However, no evidence was presented at the Rule 32 proceedings to support Wilkerson's assertion. Rule 32 counsel did not question Rad-ney regarding exactly what evidence he knew the State had against Wilkerson at the time. The only testimony presented in this regard was Radney’s testimony that the State "had so much evidence" against Wilkerson that he believed it best for Wilkerson to cooperate. (C.Supp.42.)
 

 [7]
 

 .The record from Wilkerson’s direct appeal reflects that the prosecutor stated numerous times during the pretrial proceedings that he was not seeking the death penalty
 
 because of
 
 his agreement with Radney.
 

 [8]
 

 . We note that Johnny did not testify at the Rule 32 hearing, as Wilkerson contended in his petition, that had he known Jackson was not an attorney, he would have objected to Wilkerson's being interviewed with only Jackson present and would have objected to Wilkerson’s being interviewed without him (Johnny) being present.
 

 [9]
 

 . We note that, in his petition, Wilkerson cited law and made summary conclusions, but included little or no specific facts within most of his individual claims of ineffective assistance of counsel. Rather, Wilkerson included at the beginning of his petition a "Statement of Facts” spanning over 60 pages and including over 200 paragraphs. However, absent any specific facts alleged within each individual ineffective-assistance-of-counsel claim, this Court is left to guess which of the over 60 pages of facts Wilkerson believed supported which of his claims of ineffective assistance of counsel.
 

 [10]
 

 . Although Wilkerson was ultimately tried for capital murder in relation to the murder of Donald Williams, there is no indication as to whether Wilkerson was charged or tried in relation to the attempted murder of Peter Swyers.